```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE REPUBLIC OF KAZAKHSTAN,

              Plaintiff,

         v.                              15-CV-1900 (ER)

DOES 1-100, Inclusive,

              Defendants.                Order to Show Cause
------------------------------x
                                         New York, N.Y.
                                         March 13, 2015
                                         3:30 p.m.
Before:

                    HON. EDGARDO RAMOS,

                                         District Judge

                         APPEARANCES

CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
     Attorneys for Plaintiff
BY:  JACQUES SEMMELMAN, ESQ.
     A. ROBERT QUIRK, ESQ.
```

(In the robing room; case called)

THE DEPUTY CLERK: Please state your name for the record.

MR. SEMMELMAN: Jacques Semmelman, Curtis, Mallet-Prevost, Colt & Mosle for plaintiff, The Republic of Kazakhstan, and with me is my colleague Robert Quirk from the same law firm.

THE COURT: Okay. Well, I've received your papers. I've looked at them. I can't say that I studied them carefully but I've looked at all of them briefly.

Why don't you tell me, Mr. Semmelman, what's going on here.

MR. SEMMELMAN: Thank you, your Honor. I represent the Republic of Kazakhstan, and let me start by saying that the Republic of Kazakhstan has asked me to convey its deepest respect to this court.

This is an application for a TRO, a temporary restraining order, against unknown persons who we've called the Does in our papers. We don't know yet who they are or where they are. The investigation is ongoing. These people, whoever they may be, hacked into the computers of the Republic of Kazakhstan as well as into US-based gmail accounts that are used by officials of the Republic of Kazakhstan, and the hackers stole emails and other documents. We know they stole attorney/client privileged emails because they posted some of

1  them on the internet. And we've included a number of those in
2  our submission to the court.
3       THE COURT: Where were they posted?
4       MR. SEMMELMAN: They were posted on sites that
5  originate in Kazakhstan as well as on Facebook. And we're here
6  today to prohibit the defendants from posting additional stolen
7  materials. We know, or we have every reason to believe, that
8  they stole much more than the 14 or so emails that they chose
9  to post. A lot more was taken, and we don't know quite how
10 much, but certainly a lot more than the 14, and the concern is,
11 unless they are restrained and enjoined, they're going to be at
12 liberty to just continue posting emails that consist of
13 attorney/client privileged communications, including
14 communications that went from my law firm, Curtis Mallet, to
15 the Republic of Kazakhstan, and I personally, I am on some of
16 these emails. So that is the --
17      THE COURT: Could you characterize generally what the
18 subject matter of these emails are.
19      MR. SEMMELMAN: Yes. I was advising the Republic of
20 Kazakhstan in connection with two extradition cases, and in
21 brief, there's a series of cases that arise out of a bank fraud
22 that occurred in Kazakhstan, and the bank fraud was very
23 substantial. It was done by insiders. And without getting
24 into all the details, two of the participants in that scheme
25 were located in Spain. Kazakhstan had a warrant out for each

1    of them.  An Interpol Red Notice was posted.  These individuals
2    were arrested in Spain and Kazakhstan was in the process of
3    trying to have them extradited from Spain, and while I'm not a
4    Spanish lawyer and Kazakhstan has Spanish counsel, I do have
5    expertise in the area of international extradition, so I was
6    serving as a consultant and adviser to the government of
7    Kazakhstan and in that capacity either myself or one of my
8    colleagues at Curtis Mallet was periodically sending
9    attorney/client privileged advice and commentary to the client
10   in Kazakhstan to keep them updated on what was going on and
11   also to offer our strategic insights and our thoughts.  And
12   those are the emails that your Honor will see posted on the
13   internet and attached to our papers.  So your Honor will see
14   communications between my law firm as well as our Spanish
15   co-counsel to the Republic of Kazakhstan describing what is
16   going on in these extradition cases and offering strategic
17   advice and the like.  That's what was posted.
18            THE COURT:  Do you have reason to believe that that
19   particular case was the reason for the hack or that it was
20   targeted for that reason?
21            MR. SEMMELMAN:  I assume that there's a connection
22   between the hackers and these defendants, but I cannot tell the
23   court that I have definitive proof of that.  The matter is
24   under investigation.  Logic would suggest that there's a
25   relationship.

1      THE COURT:  Does Kazakhstan have the capacity to
2 figure out who did the hacking?
3      MR. SEMMELMAN:  They're trying to.  So far that is
4 under way.  They're making every effort to try to figure that
5 out, but I cannot report that they have determined who has done
6 it.  They're certainly working on it diligently.
7      THE COURT:  Tell me about the Computer Fraud and Abuse
8 Act.  Does it indicate in your papers that there hadn't been a
9 definitive determination of what constitutes access?  Is that
10 correct?
11      MR. SEMMELMAN:  No, no, no.  Let me clarify that,
12 because there has to a degree.  The caselaw under the Computer
13 Fraud and Abuse Act, Section 1030 of Title 18, often revolves
14 around a slightly different scenario from ours.  There doesn't
15 seem to be any dispute that even though the word "unauthorized
16 access" is not defined in the statute but is applied in its
17 common sense usage, there doesn't seem to be any dispute that
18 actual hacking constitutes unauthorized access, and for
19 example, the *FXDirect* case which we cite and the *JBCHoldings*
20 case which we cite support that.
21      Where the cases go off a little bit in a different
22 direction -- and this is not really going to be relevant to
23 us -- is when you have a person who has access, who has
24 authorized access, and then misuses the material, uses it in an
25 inappropriate way.  And the cases then discuss, is that

considered unauthorized access under the statute or is that authorized access with improper use? And cases go in different directions on it.

But that's not our situation. Our situation is a hacking. Nobody had authorized access from among the people we are naming. They exercised unauthorized access, and I don't think there's really an issue there.

THE COURT: When did you discover the hacking?

MR. SEMMELMAN: Well, the client first became aware of a hacking on January 21st of this year, and they became aware of it because they learned that some of these attorney/client privileged emails had been posted online, and that's how they first became aware of it.

THE COURT: Well, that's about a month and a half ago, so why the fire drill today?

MR. SEMMELMAN: Well, the fire drill today, if we call it that, your Honor, is because, first of all, it has taken the client time to understand that they may have a remedy under US law. This is a foreign government and things have to proceed through channels. Things have to proceed in a certain manner. And it was not the initial contemplation on February 21st necessarily that we could go to a US court. I personally didn't learn about it for several weeks. Nobody was initially thinking we could go to a US federal court, invoke the CFAA and try to get relief. Things operated in the governmental way.

1  And I'm not saying that to be disparaging. I'm just saying

2  that to describe a process. There's a government, there are

3  channels, there's a hierarchy, there are people who have higher

4  positions, people who have lower positions, and things have to

5  progress.

6  THE COURT: Federal Rule of Civil Procedure 65 is not

7  foremost in the minds of the Kazakhstan officials that made

8  this discovery.

9  MR. SEMMELMAN: Not that I know. Today I would

10  perhaps think differently. But at that time, no.

11  THE COURT: Tell me about service.

12  MR. SEMMELMAN: Yes.

13  THE COURT: How do you propose to do service and why?

14  MR. SEMMELMAN: Okay. We're proposing a dual mode of

15  service. The first mode of service is, we would post a comment

16  on the very same Facebook pages that already contain our hacked

17  emails, the ones that are attached to the papers we've

18  submitted. We would go to that page on Facebook and post a

19  comment which would contain language that we've included in our

20  proposed order to show cause and that would contain links, and

21  basically it would say: Please be advised a complaint has been

22  filed in the US District Court for the Southern District of New

23  York. Here's a link to that. And then it would go on to say:

24  And the court has issued a temporary restraining order which

25  prohibits you from doing the following things. Here's a link

1  to that. And then it would give -- it would identify Curtis

2  Mallet as the law firm representing the government of

3  Kazakhstan and we would say, if you have counsel, have counsel

4  contact us, and things of that nature, so that it would be very

5  clear to anybody who has any interest in looking at the

6  Facebook page where these hacked emails were posted. And it

7  stands to reason, or it's logical, that the hackers are likely

8  to be looking at that page to see what emerges on it. They

9  will see the notice and they will get actual notice in that

10 manner. So that's one mode of service.

11         And then, to cover as many bases as we can,

12 recognizing that we don't have names, addresses, or contact

13 information of any of these John Does, to cover all the bases,

14 there are two major newspapers in Kazakhstan. One is published

15 in the Russian language, the other is published in the Kazakh

16 language. And we would propose to post the information in

17 these two newspapers on a daily basis for 30 days which tracks

18 some of the caselaw which has authorized that kind of service

19 by newspaper publication.

20         So that's our approach. And we think the two-pronged

21 approach is likely to be most effective, especially considering

22 all the circumstances here.

23         THE COURT: And have courts authorized service through

24 Facebook in the way that you suggest?

25         MR. SEMMELMAN: I don't think I can say that they've

authorized service through Facebook. I mean, courts have a lot of flexibility in terms of authorizing different forms of service when the traditional methods are just not available, and here they are not, because we don't know who the hackers are. So courts have a lot of flexibility to mold the circumstances of the service to fit the facts of the situation. And that's why we came up with this idea of posting it on the same page that the hackers have already posted because we know they access that page.

THE COURT: Why can't you go directly to Facebook? Why not engage in self-help in that fashion?

MR. SEMMELMAN: Well, to go directly to Facebook and do what?

THE COURT: And tell them: One of your users is posting information stolen from the Kazakh government. Make them take them down.

MR. SEMMELMAN: Well, we did that with regard to the first set of 14 emails, and Facebook was not responsive. They responded to us, but they didn't want to take down the postings. So we've tried that with the first set, and we now have reached a point of, okay, the first set is up, it's been out there for a while, it is what it is, but we feel that if an injunction is issued against the hackers, we at least have a basis for communicating it to the hackers, and that would be the first step in trying to prevent them from posting anything

further and cause any further damage. The damage that's been caused by the 14 emails is in the category of irreparable harm, and there may be nothing we can do about that. But going forward, we're looking to prevent further irreparable harm. That's really what we're trying to do, to prevent further irreparable harm. And a TRO is going to be a critical first step in preventing that.

THE COURT: So talk about, if you will, the requirements for the TRO. Do you meet them here?

MR. SEMMELMAN: We strongly believe we meet them here because, as the court knows, there are four factors that come into play. One is likelihood of success on the merits, and as we've already talked a little bit about, the hacking, it is unauthorized access to a protected computer as defined under Section 1030, and a protected computer is a very broad definition, which includes a computer located anywhere in the world -- those are the words of the statute -- that is used for communication or commerce with the United States. And the computer system of Kazakhstan we see is used for communication with the United States because the very emails that were hacked and posted are communications with Curtis Mallet. So the proof is right there. In addition, we put in affidavits from various people just to nail it down. But there's the proof if you need proof. So likelihood of success, we believe we have a very strong likelihood of success.

1          Irreparable harm, the caselaw says that public

2     disclosure or dissemination of attorney/client privileged

3     communications falls into the category of irreparable harm.

4     And we cite a couple of cases.  We cite *X Corp. v. Doe* and

5     *Council on American-Islamic Relations*.  These are cases where

6     the court issued an injunction saying you may not disclose

7     privileged communications because it would constitute

8     irreparable harm.

9          The third element is the balancing of the equities.

10     Well, it's hard to see any equities in favor of the hackers,

11     they really have no equities in their favor, so the balance

12     tilts decidedly in our favor.

13          And then finally, there's the issue of public

14     interest.  And there's nothing that would violate the public

15     interest here.  The public has an interest in protecting the

16     attorney/client privilege.  That's another statement, by the

17     way, from *X Corp. v. Doe*.  The public has an interest in that.

18     The public has an interest in not encouraging hackers, not

19     allowing hackers to use their hacked materials freely.  So the

20     public interest certainly points strongly in our favor.

21          So all four elements of the TRO analysis come out in

22     our favor, and I would submit, your Honor, most respectfully,

23     that we've made the showing, and we would respectfully urge the

24     court to issue the TRO.

25          THE COURT:  Question:  I'm going to issue the TRO.

1  But are you just kicking a wasp's nest here by doing this?

2  MR. SEMMELMAN:  Well, it's a fair question, and it's a
3  question that I've considered, but on balance and in
4  consultation with the appropriate people, we've concluded that
5  we would like to have the authority of the federal court behind
6  us because right now, absent issuance of an order from a
7  federal court, it's just the government of Kazakhstan
8  complaining that its computers were hacked and its gmail
9  accounts were hacked, and if we have the authority of a United
10  States District Court order, then that gives us something that
11  we can use, something we can point to, and that's why, while I
12  recognize where the question is coming from, on balance, we've
13  concluded that we're going to use the force of law to the
14  utmost ability.

15  THE COURT:  Okay.  I think we're going to put this on
16  for next Friday?

17  THE DEPUTY CLERK:  Yes, 2 p.m.

18  THE COURT:  Friday, the 20th?

19  THE DEPUTY CLERK:  Correct.

20  THE COURT:  2?

21  THE DEPUTY CLERK:  Yes.

22  THE COURT:  What about the issue of a bond?

23  MR. SEMMELMAN:  I would propose, your Honor, a nominal
24  bond, considering that there would be no harm to the
25  defendants.  We're not seizing equipment.  We're not actually

1  doing anything very affirmative here.  We're just asking them
2  to be precluded from posting these stolen materials.  So I'm
3  thinking a thousand dollars or something like that.
4           THE COURT:  A thousand dollars it is.  When can you
5  post that by?
6           MR. SEMMELMAN:  I would have to talk to my office's
7  managing attorney, who would handle that, so with Friday
8  drawing to a close, I don't think it will be today.
9           THE COURT:  Okay.
10          MR. SEMMELMAN:  Is it okay if we post it before next
11 Friday?  I don't think we're going to need that much, but I
12 don't normally personally handle the bond posting so I'm
13 reluctant to say Monday.
14          THE COURT:  Okay.  Wednesday?
15          MR. SEMMELMAN:  Okay.  Wednesday.
16          THE COURT:  Wednesday, March 18, 5:00.
17          When can you have these papers up on the links, as you
18 propose to do?
19          MR. SEMMELMAN:  On the Facebook posting?
20          THE COURT:  Yes.
21          MR. SEMMELMAN:  May I turn to my colleague?
22          THE COURT:  Sure.
23          (Counsel conferring)
24          MR. SEMMELMAN:  To be safe, we will try today, but
25 let's say tomorrow at the latest.

1    THE COURT:  So 5:00 tomorrow?

2    MR. SEMMELMAN:  Yes.  Thank you.

3    THE COURT:  By the way, is that real or --

4    MR. SEMMELMAN:  That's real.  That is the link to the
5 Facebook page.

6    THE COURT:  Okay.  Looks like a bunch of gibberish.  I
7 don't know.  I'm learning too much about Facebook these last
8 couple of days, unfortunately.

9    So we'll get a copy of this to you, and it will be put
10 on ECF.  And we'll see you next week.

11   MR. SEMMELMAN:  Thank you so much, your Honor.

12                              o0o