**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | CIVIL CASE |
| | Case No. 1:15-cv-01900-ER |
| THE REPUBLIC OF KAZAKHSTAN, | |
| Plaintiff, | |
| v. | |
| DOES 1-100 INCLUSIVE, | |
| Defendants. | |

## MEMORANDUM OF LAW OF NONPARTIES RESPUBLIKA AND LLC MEDIA-CONSULT IN SUPPORT OF MOTION FOR CLARIFICATION OF PRELIMINARY INJUNCTION ORDER

James Rosenfeld
DAVIS WRIGHT TREMAINE
1633 Broadway, 27th Floor
New York, NY 10019-6708
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
Email: jamesrosenfeld@dwt.com

David Greene (*pro hac vice application to be submitted*)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: davidg@eff.org

*Attorneys for Nonparties*
*Respublika and LLC Media-Consult*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.   BACKGROUND ....................................................................................... 2

     A.   Respublika and its History of Persecution By Kazakhstan................................. 2

     B.   The Current Lawsuit and the Court's Preliminary Injunction Order ..................... 6

II.  ARGUMENT .......................................................................................... 8

     A.   The First Amendment Protects the Publication of Newsworthy Information
          By Innocent Recipients of Such Information—Even Those Who Knew the
          Information Was Illegally Acquired—and Therefore Bars Kazakhstan From
          Applying the Preliminary Injunction To Respublika. ............................................. 8

     B.   Kazakhstan Cannot Satisfy the Preliminary Injunction Standard as Against
          Respublika Because It Can Neither Prove a Likelihood of Success In
          Prevailing Against Respublika, Nor That the Public Interest Supports
          Suppression of the Information. ........................................................................... 10

          1.   A preliminary injunction is an extraordinary remedy and is never
               awarded as a right. ...................................................................................... 10

          2.   Kazakhstan cannot prove a likelihood of irreparable harm. ..................... 10

          3.   Kazakhstan cannot prove a likelihood of success on the merits. .............. 11

          4.   The balance of equities and the public interest counsels against an
               injunction prohibiting Respublika from publishing newsworthy
               information about matters of public concern. ............................................ 12

     C.   The Preliminary Injunction Operates as an Unconstitutional Prior Restraint
          Against Respublika. ............................................................................................. 13

          1.   Preliminary injunctions enjoining speech are a form of prior restraint
               on expression and thus bear a heavy presumption against their
               constitutionality. ......................................................................................... 13

          2.   If applied to Respublika, this Court's preliminary injunction order
               would be an unconstitutional prior restraint on speech. .......................... 15

     D.   The Preliminary Injunction is Unconstitutionally Vague Because It Does
          Not Specify To Which Actors and What Specific Actions It Applies. ................. 17

E.    Applying the Preliminary Injunction To Respublika Violates the First Amendment Because the Proceeds-Disgorgement Provision Fails Strict Scrutiny. ........................................................................................................ 18

F.    Applying the Preliminary Injunction To Respublika Implicates Respublika's Rights Under the Reporters' Privilege. .......................................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## Federal Cases

*Abdul Wali v. Coughlin*,
   754 F.2d 1015 (2d Cir. 1985)..............................................................................12

*ACLU v. Reno*,
   929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997)..................13, 19

*Alexander v. United States*,
   509 U.S. 544 (1993)...............................................................................14, 15

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)......................................................................................19

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963).........................................................................................16

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001).....................................................................................8, 9

*BigStar Entm't, Inc. v. Next Big Star, Inc.*,
   105 F. Supp. 2d 185 (S.D.N.Y. 2000).............................................................12

*Bloom v. O'Brien*,
   841 F. Supp. 277 (D. Minn. 1993)..................................................................14

*Board of Education v. Pico*,
   457 U.S. 853 (1982)......................................................................................14

*CBS, Inc. v. Davis*,
   510 U.S. 1315 (1994).....................................................................................16

*City of New York v. Mickalis Pawn Shop, LLC*,
   645 F.3d 114 (2d Cir. 2011)...........................................................................19

*Corning Inc. v. PicVue Elecs., Ltd.*,
   365 F.3d 156 (2d Cir. 2004)...........................................................................19

*Cox Broadcasting Corp. v. Cohn*,
   420 U.S. 469 (1975).........................................................................................9

*Crosby v. Bradstreet Co.*,
   312 F.2d 483 (2d Cir. 1963)...........................................................................18

*Dexter Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011)..................................................................................... 11

*Faiveley v. Transport Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)................................................................................. 11

*Forschner Grp., Inc. v. Arrow Trading Co.*,
    124 F.3d 402 (2d Cir. 1997)................................................................................. 19

*Gentile* v. *State Bar of Nev.*,
    501 U.S. 1030 (1991)........................................................................................... 19

*In re Petroleum Products Antitrust Litig.*,
    680 F.2d 5 (2d Cir. 1982), cert denied, 459 U.S. 909 (1982) .......................... 22

*In re Providence Journal Co.*,
    820 F.2d 1342 (1st Cir. 1986)......................................................................... 16, 17

*Jackson v. City of Markham, Ill.*,
    773 F. Supp. 105 (N.D. Ill. 1991) ........................................................................ 13

*Landmark Communications, Inc. v. Virginia*,
    435 U.S. 829 (1978)............................................................................................... 9

*Little v. Associated Technical Training Servs., Inc.*,
    12 F.3d 205 (4th Cir. 1993) ................................................................................. 20

*Martin v. City of Struthers*,
    319 U.S. 141 (1943)............................................................................................. 14

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*,
    239 F.3d 172 (2d Cir. 2001)..................................................................... 15, 18, 19

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)................................................................................. 15, 16, 17

*Nebraska Press Ass'n. v. Stuart*,
    423 U.S. 1327 (1975)........................................................................................... 16

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)................................................................... 10, 13, 15, 16, 17

*O'Brien v. Town of Caledonia*,
    748 F.2d 403 (7th Cir. 1984) ............................................................................... 13

*O'Lone v. Estate of Shabazz,*
    482 U.S. 342 (1987)............................................................................................. 12

*Oklahoma Pub. Co. v. Dist. Court,*
    430 U.S. 308 (1977)........................................................................................... 9

*Organization for a Better Austin v. Keefe,*
    402 U.S. 415 (1971)..................................................................................... 15, 16

*Peregrine Myanmar Ltd. v. Segal,*
    89 F.3d 41 (2d Cir. 1996) ............................................................................... 19

*Red Lion Broadcasting Co. v. F.C.C.,*
    395 U.S. 367 (1969)....................................................................................... 14

*Reno v. ACLU,*
    521 U.S. 844 (1997)....................................................................................... 19

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999) ........................................................................... 12

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)....................................................................................... 19

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,*
    502 U.S. 105 (1991)....................................................................................... 21

*Smith v. Daily Mail Publishing Co.,*
    443 U.S. 97 (1979)......................................................................................... 8

*Stilp v. Contino,*
    629 F. Supp. 2d 449 (M.D. Pa. 2009),
    *aff'd and remanded*, 613 F.3d 405 (3d Cir. 2010) ........................................... 13

*Suntrust Bank v. Houghton Mifflin Co.,*
    252 F.3d 1165 (11th Cir. 2001) ..................................................................... 15

*Sussman v. Crawford,*
    488 F.3d 136 (2d Cir. 2007)...................................................................... 10, 17

*The Florida Star v. B.J.F.,*
    491 U.S. 524 (1989)......................................................................................... 9

*Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.,*
    607 F.2d 1043 (2d Cir. 1979).......................................................................... 13

*Tsering Youdon v. Bd. of Immigration Appeals*,
    204 F. App'x 89 (2d Cir. 2006) ................................................. 2

*United States v. New York Times Co.*,
    328 F. Supp. 324 (S.D.N.Y. 1971), *aff'd*, 403 U.S. 713 (1971) ...................................... 13

*United States v. Quattrone*,
    402 F.3d 304 (2d Cir. 2005) .......................................................... 9

*United States v. Quintanilla*,
    No. CR 09-01188 SBA, 2011 WL 4502668 (N.D. Cal. Sept. 28, 2011) ........................... 2

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................... 10, 11

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
    636 F.3d 874 (7th Cir. 2011) ............................................. 20

## Federal Statutes

18 U.S.C. § 1030 ........................................................... 7

## Federal Rules

Federal Rule of Civil Procedure 65 .......................................... 19

Federal Rule of Evidence 201 ................................................ 2

## Constitutional Provisions

U.S. Const., amend. I ............................................... *passim*

## PRELIMINARY STATEMENT

The plaintiff Republic of Kazakhstan has pursued this matter backwards. It obtained a preliminary injunction against speech—a disfavored and rare occurrence under any circumstances—before proving who committed the purported theft of the very information of which it seeks to suppress the dissemination. Because the First Amendment confines publication liability in such situations to those who committed the theft, Kazakhstan cannot prove a likelihood of success on the merits to justify the preliminary injunction, at least until it can identify the thief—and perhaps not even then.

Respublika, an online Kazakhstan newspaper, and LLC Media-Consult, the owner of Respublika (collectively "Respublika"), thus respectfully move—as interested nonparties—for clarification that the preliminary injunction issued by this Court on March 20, 2015 does not apply to it. Respublika is not named as a party in this lawsuit, and Kazakhstan has neither alleged nor proved that it played any role in the violations of the Computer Fraud and Abuse Act alleged in Kazakhstan's Complaint. Nor does the preliminary injunction name Respublika or specify any of Respublika's news articles. And Kazakhstan acknowledges that it has not yet even conducted the discovery that it hopes might prove that Respublika was somehow connected to the purported theft. Nevertheless, Kazakhstan has asserted that the preliminary injunction requires the removal of various Respublika articles from the Web, and indeed has achieved that result, thus using the U.S. court system to censor one of its chief critics and broadly remove criticism of the Kazakhstan government from the Internet.

Kazakhstan's misuse of this Court's order violates the First Amendment. The First Amendment protects the publication of newsworthy information by innocent recipients of such information, even those who know their source obtained the information illegally. The First Amendment therefore prohibits Kazakhstan's use of the preliminary injunction to demand the takedown of Respublika's articles concerning newsworthy documents that the newspaper found anonymously posted online. Furthermore, the preliminary injunction is being used to exact an unconstitutional prior restraint on Respublika's speech.

## I. BACKGROUND

### A. Respublika and its History of Persecution By Kazakhstan[1]

Respublika is a newspaper known internationally for its reporting on politics, corruption, financial scandals, and human rights violations in Kazakhstan.[2] Respublika was founded in 2000.[3] By 2002, as a result of Respublika's investigative reporting on President Nursultan Nazarbayev's ruling regime, the Kazakhstan government had begun to pressure Respublika and its journalists—"in criminal charges, in the court-ordered seizure of the paper, in the delivery of a funeral wreath and a decapitated dog (and later, its head), and in several firebombs."[4] Since 2002, Kazakhstan has continued its efforts to harass and intimidate individual Respublika

---

[1] This background information is found in numerous governmental reports, including those of the United States Department of State and the European Parliament. Copies of the relevant reports are included in the Declaration of David Greene ("Greene Decl.") submitted herewith. This Court may take judicial notice of these official documents pursuant to Federal Rule of Evidence 201. *See Tsering Youdon v. Bd. of Immigration Appeals*, 204 F. App'x 89, 91 (2d Cir. 2006) (taking judicial notice of facts within a 2005 State Department Report on Human Rights Practices for China); *United States v. Quintanilla*, No. CR 09-01188 SBA, 2011 WL 4502668, at *9, n.5 (N.D. Cal. Sept. 28, 2011) (taking judicial notice of the State Department's 2004 Country Report on Human Rights Practices in El Salvador).

[2] *See* Committee to Protect Journalists ("CPJ") Report, "Disdaining press freedom, Kazakhstan undermines OSCE" (Sep. 13, 2010), Greene Decl., Ex. 24 ("*Respublika* has been a persistent government critic throughout the past decade, covering sensitive subjects such as big business, economic crimes, human rights violations, the activities of the president and his family, and high-level corruption."); CPJ International Press Freedom Awards, "2002 Awardee: Irina Petrushova," Greene Decl., Ex. 29.

[3] *See id.*

[4] Michael Wines, "THE SATURDAY PROFILE; Bruised, but Still Jabbing Kazakh Heavyweights," *New York Times* (Jul. 13, 2002), Greene Decl., Ex. 44; *see also* Department of State Bureau of Democracy, Human Rights, and Labor Country Report on Human Rights Practices for Kazakhstan ("State Department Human Rights Report for Kazakhstan") (2002), Greene Decl., Ex. 1 (documenting an "intense campaign of intimidation" wages against Respublika and its editor, Irina Petrushova); European Parliament's 13 February 2003 Resolution on Human Rights in Kazakhstan and Central Asia, Greene Decl., Ex. 14 (noting that the "chief editor of Respublika Weekly, Irina Petrushova, has been sentenced to one and a half years imprisonment and is now facing three new criminal charges" among a list of an "increasing number of instances of intimidation and persecution of the press"); CPJ International Press Freedom Awards, "2002 Awardee: Irina Petrushova," Greene Decl., Ex. 29.

journalists or those who it believes to be Respublika journalists.[5] Kazakhstan has also harassed Respublika's printers,[6] leaving printing houses wary to print Respublika's newspaper for fear of retribution from authorities.[7]

Respublika circulated a print newspaper from 2000 to 2014, with various interruptions and name changes due to attempts by the Kazakhstan government to shut down and censor the newspaper.[8] These attempts include multiple libel prosecutions against Respublika's newspapers,

---

[5] State Department Human Rights Reports for Kazakhstan (2003-2014), Greene Decl., Exs. 2–13; CPJ Alert, "Kazakh court shuts down another critical newspaper" (Feb. 25, 2014), Greene Decl., Ex. 28 ("In late 2012, Kazakh courts ordered dozens of news outlets and several broadcasters to shut down on accusations of extremism, and in early 2013 banned reporters of the shuttered *Respublika* newspaper from practicing journalism altogether."); CPJ Alert, "Embattled Respublika journalists targeted in Kazakhstan" (Feb. 6, 2013), Greene Decl., Ex. 26; Luke Harding, "Kazakhstan cracks down on press freedom on eve of leading OSCE," *Guardian* (Dec. 29, 2009), Greene Decl., Ex. 45.

[6] Joanna Lillis, "Kazakhstan: The News Weekly That Won't Be Silenced," *EurasiaNet* (Mar. 9, 2011), Greene Decl., Ex. 40 ("For the last 18 months Respublika has been unable to find a printer to take on the job of publishing it."); CPJ Report, "After attack, Kazakhstan publisher goes missing" (Apr. 1, 2011), Greene Decl., Ex. 25 (reporting on the disappearance of Respublika's publisher).

[7] *See, e.g.,* State Department Human Rights Report for Kazakhstan (2009), Greene Decl., Ex. 8 ("According to the newspaper's management, other printing houses refused to print the newspaper for fear of retribution from authorities. At year's end the newspaper's staff was publishing the paper on high-speed copy machines.").

[8] State Department Human Rights Reports for Kazakhstan (2003-2014), Greene Decl., Exs. 2–13 (documenting Respublika's various name changes through the years and the many attempts by Kazakhstan authorities to force the newspaper to cease distribution); *see, e.g.,* State Department Human Rights Report for Kazakhstan (2003), Greene Decl., Ex. 2 (noting that "[t]he newspaper continued to change its name to avoid what it termed illegal judgments against it"); *see also* Organization for Security and Co-operation in Europe ("OSCE"), Press Release, "OSCE media freedom representative protests over authorities' actions against one of Kazakhstan's few independent newspapers" (Sep. 22, 2009), Greene Decl., Ex. 19; OSCE, Press Release, "OSCE representative concerned over threat to media pluralism in Kazakhstan" (Nov. 30, 2012), Greene Decl., Ex. 21; Reporters Without Borders, "Main Opposition Media Silenced in Space of a Month" (Dec. 28, 2012), Greene Decl., Ex. 35 (noting how on December 25, 2012, an Almaty court "issued an order . . . banning the eight different versions that the newspaper *Respublika* had been forced to create over time to avoid the consequences of legal proceedings[,]" including "*Golos Respubliki* (Voice of the Republic), *Respublika-Delovoye Obozrenye* (Republic-Business Magazine) and *Vsya Respublika* (Entire Republic)" and that "[t]he prohibition also applied to the 23 websites and online social network accounts that carried these newspapers' content");

resulting in exorbitant damages awards,[9] as well as the orchestration of the arrest of Respublika's founder, Irina Petrushova, in Russia.[10] In 2014, Kazakhstan permanently banned the distribution of Respublika's last print incarnation, *Assandi Times*, within the country.[11]

---

[9] Reporters Without Borders, "Copies of Opposition Weekly Seized, Journalists Arrested" (Jan. 21, 2011), Greene Decl., Ex. 33; Reporters Without Borders, "Main Independent National Media Threatened With Closure" (Nov. 21, 2012), Greene Decl., Ex. 34; Joanna Lillis, "Kazakhstan: Critical Newspaper Loses Appeal on Government Ban," *EurasiaNet* (Feb. 9, 2013), Greene Decl., Ex. 41; Roy Greenslade, "Kazakh authorities seek closure of independent media," *Guardian* (Nov. 22, 2012), Greene Decl., Ex. 46; Rayhan Demytrie, "Kazakhstan's independent media under fire," BBC News (Mar. 10, 2013), Greene Decl., Ex. 48.

[9] State Department Human Rights Report for Kazakhstan (2004), Greene Decl., Ex. 3 (discussing a $50 million KZT ($384,615 USD) libel judgment against *Assandi Times* in a civil libel suit brought by the Presidential Administration and noting that "[t]he amount of damages against *Assandi Times* was the highest ever set in a libel case"); State Department Human Rights Report for Kazakhstan (2009), Greene Decl., Ex. 8 (discussing a $60 million KZT (approximately $400,000 USD) libel judgment against Respublika in an action brought by the recently-nationalized BTA Bank, in which the bank alleged that Respublika had "caused a run on the bank's deposits by publishing articles that undermined its business reputation"); State Department Human Rights Report for Kazakhstan (2010), Greene Decl., Ex. 9 (noting that "[o]n February 2, [2010] an Almaty court prohibited the distribution of Respublika's printed newspaper due to the publication's inability to pay 60 million tenge (approximately $400,000) after it lost a 2009 lawsuit filed by BTA Bank"); *see also* OSCE, Press Release, "OSCE media freedom representative criticizes 'misuse' of libel laws to muzzle the press in Kazakhstan, Tajikistan, and Hungary" (Feb. 8, 2010), Greene Decl., Ex. 20; World Association of Newspapers and News Publishers ("WAN-IFRA"), Press Release, "WAN-IFRA Condemns Press Crackdown in Kazakhstan" (Mar. 23, 2010), Greene Decl. Ex. 37 (noting that WAN-IFRA and the World Editors Forum sent a letter to President Nursultan Nazarbayev condemning the 60 million tenge fine on Respublika as "'not only draconian' but possibly politcally [sic] motivated" and stating that "'the distribution ban restricts the ability of the newspaper, which is currently only able to publish online, to generate revenue to pay the damages'"); CPJ Alert, "Embattled Kazakh weekly paralyzed by damages" (Mar. 9, 2010), Greene Decl., Ex. 22; *see also* Joanna Lillis, "Kazakhstan: Libel Trial Rekindles Fears of Media Muzzling" *EurasiaNet* (Jul. 1, 2015), Greene Decl., Ex. 43 (discussing a June 2015 libel judgment against Nakanune.kz, a website set up by Respublika journalists after the closure of *Assandi Times* in 2014).

[10] State Department Human Rights Report for Kazakhstan (2005), Greene Decl., Ex. 4 (documenting that Petrushova was arrested and detained by Russian authorizes for two days on tax evasion charges pursuant to a warrant issued by the Kazakhstan government and that she was released after a Moscow procurator determined she had been improperly detained).

[11] State Department Human Rights Report for Kazakhstan (2014), Greene Decl., Ex. 13; European Parliament, "Kazakhstan: human rights situation" (Feb. 2015), Greene Decl., Ex. 17 ("In April 2014, the Assandi Times was ordered by a court to stop its activities after being found

Respublika thus now publishes its news only online. Furthering its systematic censorship of its critics, Kazakhstan has blocked and continues to block Respublika's website, respublika-kaz.info, along with the websites of other independent news outlets, so that they may not be read by readers in Kazakhstan.[12] Respublika's website was also subject to cyber attacks following the publication of comments critical of the government.[13]

Kazakhstan's efforts to silence Respublika and other independent news outlets are well-known to the U.S. State Department[14] and the international human rights community.[15]

---

to constitute a 'structural part' of the opposition Respublika newspaper, which was banned for alleged 'extremism' in late 2012."); CPJ Alert, "Kazakh authorities shut down another newspaper" (Apr. 3, 2014), Greene Decl., Ex. 27; Human Rights Watch, "World Report 2015: Kazakhstan," Greene Decl., Ex. 30; Human Rights Watch, "Kazakhstan: Newspaper Closing a Blow to Free Speech; Crackdown on Free Expression, Media Intensifies" (Apr. 22, 2014), Greene Decl., Ex. 32; Reporters Without Borders, "Increasingly Suffocating Climate for Media Freedom" (Apr. 3, 2014), Green Decl., Ex. 36; Joanna Lillis, "Kazakhstan: Critical Newspaper Raided and Banned," *EurasiaNet* (Apr. 2, 2014), Greene Decl., Ex. 42; Roy Greenslade, "Kazakh court orders newspaper closure *Guardian* (Apr. 22, 2014), Greene Decl., Ex. 47; *see also* Joanna Lillis, "Kazakhstan: Libel Trial Rekindles Fears of Media Muzzling" *EurasiaNet* (Jul. 1, 2015), Greene Decl., Ex. 43 (noting that the website Nakanune.kz—which was set up by Respublika journalists after the closure of *Assandi Times* in 2014—was found guilty on June 19, 2015 of libel in a case brought by Kazakhstan bank Kazkommertsbank).

[12] State Department Human Rights Reports for Kazakhstan (2010-2014), Greene Decl., Ex. 9–13; European Union, OSCE Permanent Council Nr 901, Vienna, "EU statement on opposition activities in Kazakhstan" (Feb. 9, 2012), Greene Decl., Ex. 18 ("The EU is equally concerned about the reported blocking of several internet [sic] portals linked to the 'Respublika' newspaper. Encouraging an open and effective press will only help improve the environment for long-term social, political and economic stability."); CPJ Alert, "State-owned Internet provider blocks Kazakh news sites" (Apr. 29, 2010), Greene Decl., Ex. 23; Human Rights Watch, "Kazakhstan: Growing Crackdown on Free Speech; A Year After Clash at Labor Strike Site, Those Who Reported on Violence Under Threat" (Dec. 14, 2012), Greene Decl., Ex. 31; Reporters Without Borders, "Main Opposition Media Silenced in Space of a Month" (Dec. 28, 2012), Greene Decl., Ex. 35.

[13] State Department Human Rights Report for Kazakhstan (2009), Greene Decl., Ex. 8.

[14] *See generally* State Department Human Rights Reports for Kazakhstan (2003-2014), Greene Decl., Exs. 2–13; *see, e.g.,* State Department Human Rights Report for Kazakhstan (2014), Greene Decl., Ex. 13 (listing "restrictions on freedom of speech, press, assembly, religion, and association" as one of the "most significant human rights problems" in the country and documenting the pervasive harassment and intimidation campaigns waged by the Kazakhstan government against the press: "the government limited freedom of expression and exerted

**B.      The Current Lawsuit and the Court's Preliminary Injunction Order**

This lawsuit arises out of the anonymous posting of tens of thousands of leaked emails and other documents—estimated to be a total of 69 gigabytes—to the website http://kazaword.wordpress.com ("kazaword").[16] The materials were first posted to kazaword in or around August 2014,[17] and Respublika and other news organization across Europe and Central Asia have reported on the kazaword documents since then.[18]

Kazakhstan responded to the posting of documents on kazaword by filing this lawsuit on March 12, 2015, alleging that unnamed "Doe" defendants had accessed the kazaword documents without authorization in violation of the Computer Fraud and Abuse Act ("CFAA"). *See* Complaint, Case No. 1:15-cv-01900 (ER), ECF No. 1. Neither Respublika nor any of its editors are named as defendants in the Complaint.[19]

---

influence on the media through a variety of means, including laws, harassment, licensing regulations, internet restrictions, and criminal and administrative charges").

[15] *See generally* European Parliament, 13 February 2003 Resolution on the Human Rights in Kazakhstan and Central Asia, Greene Decl., Ex. 14; European Parliament, Resolution of 15 March 2012 on Kazakhstan, Greene Decl., Ex. 15; European Parliament, 17 April 2013 Resolution on the Human Rights Situation in Kazakhstan, Greene Decl., Ex 16; European Parliament, "Kazakhstan: human rights situation" (Feb. 2015), Greene Decl., Ex. 17; European Union, OSCE Permanent Council Nr 901, Vienna, "statement on opposition activities in Kazakhstan" (Feb. 9, 2012), Greene Decl., Ex. 18; Joanna Lillis, "Kazakhstan: Libel Trial Rekindles Fears of Media Muzzling" *EurasiaNet* (Jul. 1, 2015), Greene Decl., Ex. 43 ("Respublika's demise occurred amid a sweeping, internationally-condemned media crackdown that left only a handful of independent outlets in business."); *see also* Joanna Lillis, "Kazakhstan: More Media Silenced As High-Stakes Feud Continues," *EurasiaNet* (Nov. 9, 2007), Greene Decl., Ex. 38, Joanna Lillis, "Kazakhstan: Are OSCE Duties Exerting Positive Influence on Astana?," *EurasiaNet* (Feb. 10, 2010), Greene Decl., Ex. 39.

[16] Agathe Duparc, "Bernard Squarcini, at Kazakhstan's service against regime opponent Ablyazov," Mediapart.fr (Feb. 26, 2015), Greene Decl., Ex. 49.

[17] *See id.*

[18] *See, e.g.,* Sylvain Besson, "Le Kazakhstan enrôle un expert genevois dans sa campagne d'influence occulte," *Le Temps* (Jun. 17, 2015), Greene Decl., Ex. 50.

[19] A few weeks prior, Kazakhstan had filed a similar Doe lawsuit in California state court alleging violations of both the CFAA and the California Comprehensive Computer Data Access and Fraud Act. *See* The Republic of Kazakhstan v. Does 1-100 inclusive, Santa Clara County

Kazakhstan then moved this Court for a temporary restraining order and preliminary injunction to prevent the unnamed defendants from further disseminating what it called the "Stolen Materials." *See* Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction, Case No. 1:15-cv-01900 (ER), ECF No. 7. On March 20, 2015, this Court granted Kazakhstan's motion, enjoining the unnamed defendants— defined as the individuals allegedly responsible for or otherwise associated with the unauthorized access of documents from Kazakhstan computers and Gmail accounts—from further disseminating, using, or viewing those documents. *See* Preliminary Injunction Order ("Order"), ECF No. 10, at 2, 9. Neither Respublika nor any of its editors were named in the Order, and the Order did not specify that any specific Respublika articles had to be removed from the Web; it refers only generally to the "Stolen Materials." *See id.*

Purportedly relying on this Court's Order, Kazakhstan sent Respublika's web host, Black Lotus, multiple letters and emails asserting that Black Lotus was hosting "Stolen Materials" in derogation of the Order and demanding that Black Lotus remove 47 separate articles from Respublika's website. *See* Greene Decl., ¶¶ 52–56 & Exs. 51, 52, 53, 54. Although several of the articles that Kazakhstan demanded Black Lotus remove reported on documents or emails that had been posted on kazaword, at least four articles were based on information obtained from other sources. *See* Greene Decl., ¶ 57. On June 12, 2015, Kazakhstan demanded that Black Lotus disable Respublika's website in its entirety, stating that such was required to ensure compliance with this Court's Order. *See* Greene Decl., ¶ 55 & Ex. 54.

There is no indication that Kazakhstan has attempted—successfully or otherwise—to secure the takedown of articles by other news outlets concerning the kazaword documents. As such, articles about Kazakhstan's corruption were censored in the United States under the authority of this Court's Order, while they remained available in other parts of the world.

---

Superior Court, Case No. 1-15-cv-277067, Complaint, ECF No. 1 (Feb. 20, 2015). Respublika is also not named as a defendant in the California lawsuit, which remains pending.

## II.  ARGUMENT

### A.  The First Amendment Protects the Publication of Newsworthy Information By Innocent Recipients of Such Information—Even Those Who Knew the Information Was Illegally Acquired—and Therefore Bars Kazakhstan From Applying the Preliminary Injunction To Respublika.

The First Amendment rule that persons have a near absolute right to publish truthful information about matters of public interest that they lawfully acquire is a foundational principle in this case. *See Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979). This *Daily Mail* rule protects the publication of the kazaword documents by anyone other those directly involved in their purported "theft." The rule thus prevents Kazakhstan from getting an injunction, preliminary or permanent, against the general publication of the kazaword documents, or any information derived from them.

Most recently, in *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001), the Supreme Court affirmed that the *Daily Mail* rule applies even if a re-publisher of information knew that its source had obtained the information illegally. In *Bartnicki*, two persons whose telephone conversation was illegally recorded sued Vopper under state and federal wiretapping laws after he repeatedly played excerpts of the conversation on his radio show. *Id.* at 519–20. Each wiretapping law made it both illegal and civilly actionable to "intentionally disclose" illegally recorded conversations. *Id.* at 520 & n.3 (citing 18 U.S.C. § 2511(1)(c)). But the Court found that the disclosure prohibitions could not be constitutionally applied against Vopper, explaining that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535.

The *Daily Mail* rule has been applied to a wide variety of information in which there were significant governmental interests in keeping the information confidential. In *Daily Mail* itself, the Court protected the publication of the name of a juvenile defendant despite the fact that state law deemed such information confidential. 443 U.S. at 104; *see also Oklahoma Pub. Co. v. Dist. Court*, 430 U.S. 308, 311–12 (1977) (same). The *Daily Mail* rule has similarly protected the publication of other information deemed confidential by law, including information regarding

judicial disciplinary proceedings, *see Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839 (1978), and the name of a sexual assault victim. *See The Florida Star v. B.J.F.*, 491 U.S. 524, 537–38 (1989); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 495 (1975). The Second Circuit has applied the rule to invalidate a judicial order preventing publication of names of jurors mentioned in open court. *United States v. Quattrone*, 402 F.3d 304, 313 (2d Cir. 2005) (Sotomayor, J. opinion).

The rule has been applied to both criminal and civil penalties against publication. *See Bartnicki*, 532 U.S. at 521 & n.3 (both); *Florida Star*, 491 U.S. at 526 (civil); *Landmark Communications*, 435 U.S. at 830 (criminal); *Daily Mail*, 443 U.S. at 99 (criminal); *Cox Broadcasting*, 420 U.S. at 471 (civil).

The rule has also been applied to judicial orders enjoining publication. *See Oklahoma Publishing*, 430 U.S. at 308. Indeed, an early version of the rule is found in the seminal *Pentagon Papers* case, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam). In that case, the Court invalidated injunctions against the publication of a classified Defense Department report that had purportedly been stolen by the newspapers' source, despite the fact that the government claimed the publication of the report would damage national security. *Id.* at 723–24. As Justice Brennan explained, "Unless and until the Government has clearly made out its case, the First Amendment commands that no injunction may issue." *Id.* at 727 (Brennan, J. concurring).

The upshot of this well-established body of law is that, subject to exceptions not applicable here, the First Amendment does not permit information relating to matters of public concern to be deemed contraband, whereby the information can never be published by anyone. Restrictions on publication—or liability—can only be imposed on those who took part in the unlawful activity.

In obtaining the preliminary injunction against unknown Doe defendants, and in applying that order to Respublika, Kazakhstan has done precisely what *Daily Mail* and *Bartnicki* forbid. At most, Kazakhstan can obtain relief against only those whom it can prove actually stole the

documents. But the preliminary injunction cannot apply to any entity, such as Respublika, that Kazakhstan has not proved was involved in the purported theft.

**B.     Kazakhstan Cannot Satisfy the Preliminary Injunction Standard as Against Respublika Because It Can Neither Prove a Likelihood of Success In Prevailing Against Respublika, Nor That the Public Interest Supports Suppression of the Information.**

**1.     *A preliminary injunction is an extraordinary remedy and is never awarded as a right.***

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It is a "drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotations and citation omitted; emphasis in original).

A plaintiff seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities weighs in its favor, and (4) that an injunction is in the public interest. *Winter,* 555 U.S at 20.

Kazakhstan has failed to establish—and cannot establish—that these factors favor applying the preliminary injunction to Respublika.

**2.     *Kazakhstan cannot prove a likelihood of irreparable harm.***

To establish that it is likely to suffer irreparable harm in the absence of a preliminary injunction, Kazakhstan must prove that the injury it would suffer while waiting for a trial on the merits is "'neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Faiveley v. Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). Because the feared injury must be "irreparable," the plaintiff must prove that "'a monetary award cannot be adequate compensation.'" *Dexter Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (citation omitted).

Kazakhstan has not proven, and cannot prove, that it will suffer any additional harm—let alone harm—by the continued publication of Respublika's articles while it pursues this action to completion. The materials posted on kazaword remain available to the public and other news organizations around the world have reported on them and continue to report on them, regardless of whether Respublika is barred from publishing them.

### 3. *Kazakhstan cannot prove a likelihood of success on the merits.*

A preliminary injunction may issue only if a court finds that the movant is likely to prevail on the merits of the underlying controversy—here, an alleged violation of the CFAA. And as the *Daily Mail* rule makes clear, Kazakhstan must prove that CFAA violation *against Respublika* in order to apply the preliminary injunction to Respublika. To show a likelihood of success, Kazakhstan must establish that its probability of prevailing against Respublika is "better than fifty percent." *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), overruled on other grounds, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *see also BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000). Moreover, where, as here, the preliminary injunction requires an affirmative act, such as removal of Respublika's articles, the plaintiff must demonstrate a "substantial" likelihood of success on the merits. *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999).

Kazakhstan has not demonstrated *any* likelihood of succeeding on the merits of its CFAA claim against Respublika. Indeed, it conceded in its letter to this Court opposing Respublika's request to bring this motion that, at present, it has merely a suspicion that Respublika was somehow involved in the purported misconduct, and that it was pursuing discovery under the Hague Convention to gather evidence that it hoped would prove up that guess. Kazakhstan has proffered no existing evidence of Respublika's involvement in the alleged unauthorized access to the kazaword documents – because there is none. Kazakhstan is not even confident enough of its guess to name Respublika as a defendant in this case, despite the fact that Kazakhstan is well aware of not only Respublika's existence, but also of its publication of articles concerning the kazaword documents.

**4.** ***The balance of equities and the public interest counsels against an injunction prohibiting Respublika from publishing newsworthy information about matters of public concern.***

Kazakhstan also has not, and cannot, show that the balance of the equities and the public interest weights in favor of a preliminary injunction enjoining Respublika's publication of articles concerning the kazaword documents

The public interest favors protecting First Amendment rights and the free flow of newsworthy information to the public, not restricting it. *See ACLU v. Reno*, 929 F. Supp. 824, 851 (E.D. Pa. 1996) *aff'd*, 521 U.S. 844 (1997). Thus, the initial preliminary injunction sought by the government against the publication of the Pentagon Papers was denied in order to protect "the free flow of information so that the public will be informed about the Government and its actions." *United States v. New York Times Co.*, 328 F. Supp. 324, 331 (S.D.N.Y. 1971), *aff'd*, 403 U.S. 713 (1971). Indeed, preliminary injunctions are typically granted only when they enjoin efforts to restrict free speech, not the other way around. *See Thomas v. Bd. of Ed., Granville Cent. Sch. Dist.,* 607 F.2d 1043, 1047 (2d Cir. 1979) ("At the heart of the First Amendment is the ineluctable relationship between the free flow of information and a self-governing people, and courts have not hesitated to remove the occasional boulders that obstruct this flow."); *Jackson v. City of Markham, Ill.*, 773 F. Supp. 105, 110 (N.D. Ill. 1991) (quoting *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984)) (granting preliminary injunction against ordinance that had forbidden picketing because "the public interest will be served by allowing Ms. Jackson to demonstrate and thereby add to 'the free flow of information and ideas'"); *Stilp v. Contino*, 629 F. Supp. 2d 449, 467 (M.D. Pa. 2009), *aff'd and remanded*, 613 F.3d 405 (3d Cir. 2010) (granting a preliminary injunction to stop enforcement of a statute prohibiting disclosure of ethical complaints, reasoning that "there is undoubtedly a strong public interest in preserving the free flow of political criticism and debate in the Commonwealth"); *Bloom v. O'Brien*, 841 F. Supp. 277, 283 (D. Minn. 1993) (granting preliminary injunction against statute that barred disclosure of tax information explaining that "[t]he public has an interest in obtaining full and accurate information").

Applying the preliminary injunction to Respublika threatens not only Respublika's First Amendment right to report on matters of public concern, but also the public's First Amendment interest in having access to newsworthy information concerning corruption, cronyism, and nepotism within Kazakhstan's ruling regime. *See Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding that the First Amendment not only "embraces the right to distribute literature," but it also "necessarily protects the right to receive it"); *Board of Education v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.").

C.    **The Preliminary Injunction Operates as an Unconstitutional Prior Restraint Against Respublika.**

1.    *Preliminary injunctions enjoining speech are a form of prior restraint on expression and thus bear a heavy presumption against their constitutionality.*

Moreover, this particular preliminary injunction is subject to even greater and more demanding scrutiny because it is a prior restraint. A prior restraint is an administrative or judicial order "*forbidding* certain communications when issued in advance of the time that such communications are to occur," in contrast to orders imposing liability for such speech after publication. *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original). Preliminary injunctions against speech, whether by preventing publication or requiring de-publication, are "classic examples of prior restraints." *Id.* (staying a state court's preliminary injunction because it was a prior restraint); *see also Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971) (invalidating temporary injunction against distribution of pamphlets as a prior restraint); *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) (finding that a preliminary injunction preventing a union from certain public speech "plainly constitutes a broad prior restraint on

speech"); *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (holding that a preliminary injunction preventing publication of book by copyright infringement defendant was "an unlawful prior restraint in violation of First Amendment").

The preliminary injunction entered in this case is a prior restraint because, when applied to Respublika, it enjoins Respublika from "using, disclosing, . . . hosting, copying, . . . providing access to or making available to anyone, in any manner whatsoever the Stolen Materials." Order at 9. That is, it bars Respublika from publishing any content from the kazaword documents or "using" it as the basis of its reporting.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). While "a threat of criminal or civil sanctions after publication 'chills' speech, [a] prior restraint 'freezes' it at least for the time." *Id; see also Alexander,* 509 U.S. at 554 (1993) ("[W]e have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments[.]"); *New York Times*, 403 U.S. at 719  (Black, J. concurring) ("No one can read the history of the adoption of the First Amendment without being convinced beyond any doubt that it was injunctions [infringing freedom of the press] that Madison and his collaborators intended to outlaw in this Nation for all time."); *In re Providence Journal Co.*,   820 F.2d 1342, 1349 (1st Cir. 1986) (holding that a temporary restraining order against publication of documents allegedly wrongly obtained from the government was an invalid prior restraint). Even for temporary orders, when "a direct prior restraint is imposed upon the reporting of news by the media, each passing day may constitute a separate and cognizable infringement of the First Amendment." *Nebraska Press Ass'n. v. Stuart,* 423 U.S. 1327, 1329 (1975) (Blackmun, Circuit Justice, in chambers).

As a result, courts have long-held that prior restraints on expression "bear[] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963); *accord Organization for a Better Austin*, 402 U.S. at 419. Even in cases concerning questions of allegedly urgent national security, *see New York Times,* 403 U.S. at 714, or

competing constitutional interests, *see Nebraska Press*, 427 U.S. at 559, the Supreme Court has declined to impose this "'most extraordinary remed[y]' because of a lack of proof that "the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, Circuit Justice, in chambers) (citation omitted). This strong disapproval of prior restraints is not diminished by allegations that the information sought to be banned from dissemination was obtained illegally or tortiously. *See id.* at 1318. ("Nor is the prior restraint doctrine inapplicable because the videotape was obtained through the 'calculated misdeeds' of CBS. . . . Subsequent civil or criminal proceedings, rather than prior restraints, ordinarily are the appropriate sanction for calculated defamation or other misdeeds in the First Amendment context."); *New York Times*, 403 U.S. at 714.

Indeed, the Supreme Court has never upheld a prior restraint on the publication of news. *Providence Journal,* 820 F.3d at 1348–49.

To pass constitutional muster, a prior restraint against the press must be *necessary* to further a governmental interest of the highest magnitude. *See Nebraska Press*, 427 U.S. at 562. A prior restraint will be deemed necessary *only if*: (1) the harm to the governmental interest will definitely occur; (2) the harm will be irreparable; (3) no alternative exists for preventing the harm; and (4) the prior restraint will actually prevent the harm. *See id.* at 562; *id*. at 571 (Powell, J., concurring); *see also New York Times*, 403 U.S. at 730 (Stewart, J., concurring) (explaining that the order barring temporarily publication of the *Pentagon Papers* was an unconstitutional prior restraint because government failed to show the publication would clearly result in direct, immediate, and irreparable harm to the nation).

   **2.  *If applied to Respublika, this Court's preliminary injunction order would be an unconstitutional prior restraint on speech.***

Kazakhstan's preliminary injunction, as applied to Respublika, cannot meet this demanding standard.

Most glaringly, Kazakhstan cannot demonstrate that the preliminary injunction will prevent the harm it claims to be suffering. On this point *Nebraska Press* is instructive. In that case, the Supreme Court found that a gag order delaying publication of a defendant's confession until after the jury had been empaneled would not prevent the harm because the confession had already been widely published, and because many of the publishers operated outside of the court's jurisdiction. *Nebraska Press*, 427 U.S. at 567. Likewise, here, the information Kazakhstan seeks to suppress has been, and continues to be, available to and published by other news outlets throughout the world. A preliminary injunction against Respublika's publication of such information would thus be similarly futile.

But the preliminary injunction fails the prior restraint test for other reasons as well. Kazakhstan has not demonstrated that ceasing publication of the information exposing corruption and inside-dealing will advance a governmental interest of the highest magnitude. Nor can it show that the harm it seeks to prevent is irreparable unless it can show that whatever injury it might suffer from continued publication cannot be remedied by an award of damages after a full adjudication of its claims. *See Metropolitan Opera*, 239 F.3d at 177–78. And an obvious alternative to the preliminary injunction that is being applied to Respublika is one that on its face clearly applies only to the person who actually conducted the purported theft. *See Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963) (invalidating an overly broad injunction as an unconstitutional prior restraint).

**D. The Preliminary Injunction is Unconstitutionally Vague Because It Does Not Specify To Which Actors and What Specific Actions It Applies.**

Although vagueness is always a concern in preliminary injunctions,[20] it is a special concern when such orders seek to enjoin speech. *See Reno v. ACLU*, 521 U.S. 844, 871–72 (1997); *Gentile* v. *State Bar of Nev.,* 501 U.S. 1030, 1048–1051 (1991); *Metropolitan Opera*, 239 F.3d at 178–79. A vague speech restriction fails to provide "an ascertainable standard of conduct" for those to whom it applies, *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), thus chilling the protected speech of those who want to make sure they are not violating the order's commands. *See Reno*, 521 U.S. at 874–79 (1997).

Here, it is unclear both to whom the preliminary injunction applies and what materials must be taken down. The preliminary injunction (and Kazakhstan's other pleadings) refer only to unnamed "Doe" defendants and "their affiliates, employees, agents and representatives, and all persons acting in concert with or participating with Defendants." *See* Order at 9. Even outside of the First Amendment context, injunctions against Doe defendants are only permissible when the

---

[20] Rule 65(d)(1) provides that "[e]very order granting an injunction and every restraining order must . . . state its terms specifically; and . . . describe in reasonable detail–and not by referring to the complaint or other document–the act or acts restrained or required." Fed. R. Civ. P. 65. The policy behind the rule is "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard,* 414 U.S. 473, 476 (1974) (citations omitted). Indeed, "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.* The Second Circuit has cautioned that injunctions that do not satisfy the requirements of Rule 65(d) "will not withstand appellate scrutiny." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (citing *Corning Inc. v. PicVue Elecs., Ltd.,* 365 F.3d 156, 158 (2d Cir. 2004) (per curiam)). The Second Circuit has further held that, "[i]n addition to complying with Rule 65(d)'s specificity requirements, district courts must take care to ensure that injunctive relief is not overbroad." *Id; see also Forschner Grp., Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir. 1997) (noting that although a district court has "wide . . . discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," it is nonetheless "the essence of equity jurisdiction" that a court is only empowered "to grant relief no broader than necessary to cure the effects of the harm caused by the violation") (internal quotation marks omitted); *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir. 1996) (holding that injunctive relief should be "narrowly tailored to fit specific legal violations") (internal quotation marks omitted).

Doe is a known member of a group that is named in the injunction, *see Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011), or is known to have acted in concert with or conspired with a named defendant. *See Little v. Associated Technical Training Servs., Inc.*, 12 F.3d 205 (4th Cir. 1993). The preliminary injunction is equally vague as to what specific speech is barred from publication.[21]

Indeed, it is this very vagueness that Kazakhstan exploited in demanding that Facebook and Black Lotus remove Respubika's articles. Those service providers, who are not a part of this litigation, could not determine from the Order (or any other pleadings, had they examined them) whether the preliminary injunction applied to Respublika and the articles Kazakhstan labeled as contraband. Kazakhstan was thus able to make the broad, unilateral claims that resulted in the censorship of Respublika.

**E.    Applying the Preliminary Injunction To Respublika Violates the First Amendment Because the Proceeds-Disgorgement Provision Fails Strict Scrutiny.**

In addition to enjoining the unnamed "Doe" defendants from further disseminating, using, or viewing those documents, the preliminary injunction requires the "Doe" defendants and "their affiliates, employees, agents and representatives, and all persons acting in concert with or participating with Defendants" to "turn over to the Court any proceeds that Defendants have received as a result of their misappropriation and use of the Stolen Materials." *See* Order at 9. If applied to Respublika, the preliminary injunction would unlawfully chill legitimate reporting on matters of public interest via this disgorgement of profits mandate. The Supreme Court struck down a similar profit-disgorgement provision, New York's "Son of Sam" law, in *Simon &*

---

[21] *See* Order at 2 (defining "Stolen Materials" as the "thousands of government emails and other documents containing sensitive, proprietary, confidential, and attorney-client privileged government documents belonging to the Republic of Kazakhstan" misappropriated by the unnamed defendants).

*Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). The Court found that the law was not narrowly tailored to achieve the state's objective of compensating victims from profits of crime. *Id.* at 118–21.

Like in *Simon & Schuster*, the proceeds-disgorgement provision cannot satisfy strict scrutiny when applied to publications. *See id.* at 116. As such, for this reason, too, enforcement of the preliminary injunction against Respublika violates the First Amendment.

F.    **Applying the Preliminary Injunction To Respublika Implicates Respublika's Rights Under the Reporters' Privilege.**

The preliminary injunction also requires the "Doe" defendants and "their affiliates, employees, agents and representatives, and all persons acting in concert with or participating with Defendants" to deliver "all copies of any materials . . . that contain or reflect any information derived from the Stolen Materials." *See* Order at 9. If the preliminary injunction applies to Respublika, this broad language would require production of Respublika's unpublished notes and source materials.

Respublika, like other news entities, enjoys protection against the compelled disclosure of its unpublished journalistic information. Before a journalist can be ordered to produce such information, the Second Circuit requires "a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *In re Petroleum Products Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982), cert denied, 459 U.S. 909 (1982) (citations omitted).

Kazakhstan has not attempted to, and could not, make such a showing here. The application of the Order to Respublika thus additionally violates Respublika's rights under the reporters' privilege.

## CONCLUSION

For the reasons set forth herein, this Court must grant this motion and clarify that the preliminary injunction does not apply to Respublika.

Dated: August 4, 2015                                     Respectfully submitted,

                                    By:     _/s/ James Rosenfeld_____
                                            James Rosenfeld
                                            DAVIS WRIGHT TREMAINE
                                            1633 Broadway, 27th Floor
                                            New York, NY 10019-6708
                                            Telephone: (212) 489-8230
                                            Facsimile: (212) 489-8340
                                            Email: jamesrosenfeld@dwt.com

                                            David Greene
                                            (*pro hac vice application pending*)
                                            ELECTRONIC FRONTIER
                                            FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA 94109
                                            Phone: 415-436-9333
                                            Fax: 415-436-9993
                                            Email: davidg@eff.org

                                            *Attorneys for Nonparties*
                                            *Respublika and LLC Media-Consult*