UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                     :

THE REPUBLIC OF KAZAKHSTAN,      :

                         :

                 Plaintiff,      :

                         :

           -against-        :

                         :  15 Civ. 1900 (ER)

DOES 1-100 INCLUSIVE,         :

                         :

               Defendants.     :

                         :
-------------------------------------------------------------------- X

**PLAINTIFF THE REPUBLIC OF KAZAKHSTAN'S
MEMORANDUM OF LAW IN OPPOSITION TO
RESPUBLIKA AND LLC MEDIA-CONSULT'S
MOTION FOR CLARIFICATION OF PRELIMINARY INJUNCTION ORDER
<u>AND IN SUPPORT OF CROSS-MOTION FOR EXPEDITED DISCOVERY</u>**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

I.      The Hacking................................................................................. 4

II.     The Mega Archives................................................................... 5

III.    Respublika's Dissemination of Stolen Materials,
        Including Some Not Obtained From The Kazaword Website ........................... 6

IV.     Respublika's Dissemination Of Other Illegally-Obtained Materials................. 7

V.      Respublika's Putative Compliance For Three Months With The TRO And Injunction..... 8

VI.     Respublika Is Far And Away The Leading Publisher Of Stolen Materials..................... 14

VII.    There Are Serious Questions About Respublika's Relationship With Ablyazov............ 15

ARGUMENT ......................................................................................................16

THE COURT SHOULD DEFER DECISION ON THE MOTION PENDING AN
EVIDENTIARY HEARING AND SHOULD GRANT PLAINTIFF'S  CROSS-MOTION
TO TAKE DISCOVERY IN AID OF THAT HEARING..............................................16

I.      The First Amendment Does Not Protect The Publication Of Illegally-Obtained Materials
        Where The Publisher Is In  Active Concert With Those Who Obtained The Materials
        Illegally ...................................................................................... 17

II.     Whether Respublika Is In Active Concert With The Hackers
        Needs To Be Resolved At An Evidentiary Hearing, And The
        Court Should  Allow Discovery In Aid Of Such A Hearing .......................... 21

        A.      The Court Should Set This Case Down For An Evidentiary Hearing ................. 21

        B.      The Court Should Allow Expedited Discovery
                In Aid Of The Evidentiary Hearing .................................................... 22

        C.      Respublika Cannot Bar All Discovery By Invoking The Reporter's Privilege .... 24

CONCLUSION.....................................................................................................25

## Table of Authorities

**Page**

**Cases**

*American Broadcasting Companies, Inc. v. Aereo, Inc.*,
   874 F. Supp. 2d 373 (S.D.N.Y. 2012) ............................................................ 22, 24

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ...................................................................................... 19, 20

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ............................................................................................ 19

*CBS Inc. v. Davis*,
   510 U.S. 1315 (1994) .......................................................................................... 18

*Chevron Corp. v. Berlinger*,
   629 F.3d 297 (2d Cir. 2011) ............................................................................... 25

*Cox Broadcasting Corp. v. Cohn*,
   420 U.S. 469 (1974) ............................................................................................ 18

*In re Chevron*,
   736 F. Supp. 2d 773 (S.D.N.Y. 2010) ................................................................ 24

*Keybank Nat'l Assoc. v. Quality Pay-Roll Sys., Inc.*,
   No. 06-3013 (JS), 2006 WL 1720461 (E.D.N.Y. Jun. 22, 2006) ........................ 23

*Landmark Communications, Inc. v. Virginia*,
   435 U.S. 829 (1978) ............................................................................................ 18

*Litwin v. OceanFreight*,
   865 F. Supp. 2d 385 (S.D.N.Y. 2011) ................................................................ 23

*New York Times Co. v. Unites States*,
   403 U.S. 713 (1971) ............................................................................................ 18

*Notaro v. Koch*,
   95 F.R.D. 403 (S.D.N.Y. 1982) ..................................................................... 23, 24

*Oklahoma Pub. Co. v. Dist. Court*,
   430 U.S. 308 (1977) ............................................................................................ 18

*Peavy v. WFAA-TV, Inc.*,
   221 F.3d 158 (5th Cir. 2000), *cert. denied*, 532 U.S. 1051 (2001) .................. 19, 20

*Smith v. Daily Mail Publishing Co.*,
   443 U.S. 97 (1979) ......................................................................................... 17, 18

*The Florida Star v. B.J.F.*,
   491 U.S. 524 (1989) ............................................................................................ 18

*United States v. Quattrone*,
   402 F.3d 304 (2d Cir. 2005) ............................................................................... 18

*Vuitton et Fils S.A. v. Carousel Handbags,*
    592 F.2d 126 (2d Cir. 1979) ................................................................ 21, 22

*WFAA-TV, Inc. v. Peavy,*
    532 U.S. 1051 (2001)............................................................................... 20

*Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,*
    339 F.3d 101 (2d Cir. 2003) ................................................................... 23

*Zeneca, Inc. v. Eli Lilly & Co.,*
    No. 99-1452, 1999 WL 509471 (S.D.N.Y. July 19, 1999).................... 22

**Statutes**

18 U.S.C. § 1030............................................................................................ 1, 20

Plaintiff The Republic of Kazakhstan respectfully submits this Memorandum of Law in Opposition to Respublika and LLC Media-Consult's (collectively, "Respublika") Motion for Clarification of the Preliminary Injunction Order (the "Motion") and in support of Plaintiff's Cross-Motion for Expedited Discovery (the "Cross-Motion").

## Preliminary Statement

Respublika asks the Court to accept on faith (i) that Respublika was not a participant in the hacking of Plaintiff's computer system or of the email accounts of Plaintiff's officials that violated 18 U.S.C. § 1030, and (ii) that Respublika is not acting in concert with the hackers in posting materials stolen by the hackers.  Respublika has not even submitted an affidavit from a competent witness denying involvement in the hacking or denying that Respublika is acting in concert or participation with the hackers.

Instead, Respublika resorts to the stratagem of slipping unsubstantiated factual assertions into its counsel's memorandum of law.  But such statements are not evidence.  The absence of an affidavit from a competent witness who states unequivocally that Respublika was not involved in the hacking and is not acting in concert or participation with the hackers, is telling indeed.  Respublika wants this Court to rule, without evidence, without an evidentiary hearing, and without discovery, that Respublika is not subject to the Court's Preliminary Injunction issued March 20, 2015 (the "Injunction").  The Court should not rule on the basis of this record.  The Court should rule on the basis of an evidentiary hearing, aided by discovery.

By its terms, and consistent with Fed. R. Civ. P. 65, the Injunction applies to the hackers as well as to anyone in active concert or participation with the hackers.  (ECF No. 010 at p. 9.) While Respublika portrays itself as an independent member of the media entitled to the benefits of the First Amendment, Respublika cannot avoid the fundamental principle that a member of the media that acts in concert or participation with criminals forfeits its First Amendment rights.

The issue therefore, is one of fact:  If Respublika is in active concert or participation with the hackers, it is not entitled to First Amendment protection, and is bound by the Injunction.

In addition to the absence of any competent testimony from Respublika, the evidence adduced to date shows that critical, unsubstantiated factual assertions found in Respublika's counsel's memorandum of law (ECF No. 036) are incorrect.  These include:

- That Respublika found all of the Stolen Materials "anonymously posted online" on the website kazaword.wordpress.com (the "Kazaword Website").  (ECF No. 036 at pp. 1, 6.)  But as documented in the accompanying evidentiary materials,[1] Respublika has posted Stolen Materials that have never appeared on the Kazaword Website. (Graif Decl., Ex. 15.)  This leaves unanswered the very serious question of how Respublika really obtained the Stolen Materials, and what role Respublika played in misappropriating them.

- That "[t]he materials posted on kazaword remain available to the public[.]"  (ECF No. 036 at p. 11.)  That is not so.  On May 12, 2015, Plaintiff's counsel served the Injunction on Automattic, Inc. ("Automattic"), the U.S. web host for the Kazaword Website.  By May 26, 2015, all of the links to Stolen Materials on the Kazaword Website site had been removed, and have not been restored.  The links to Stolen Materials previously posted on the Kazaword Website have thus been unavailable to the public for three months.  (Graif Decl., ¶ 15.)

---

[1] Plaintiff submits the following declarations (and exhibits thereto) in Opposition to the Motion and in support of its Cross-Motion:  the Declaration of Jacques Semmelman, dated August 21, 2015 (the "Semmelman Decl."); the Declaration of Michael R. Graif, dated August 24, 2015 (the "Graif Decl."); and the Declaration of Iryna Voronov, dated August 25, 2015 (the "Voronov Decl.").

- That Plaintiff is solely targeting Respublika.  (ECF No. 036 at p. 7.)  As stated above, Plaintiff's counsel also served the Injunction on Automattic, and the links on the Kazaword Website were promptly removed.

- That "other news organizations throughout the world have reported on" the materials on the Kazaword Website "and continue to report on them, regardless of whether Respublika is barred from publishing them."  (ECF No. 036 at p. 11.)  Respublika identifies no other media site that exploits and publishes Stolen Materials in a systematic and ongoing way, as Respublika has been doing.  Respublika essentially stands alone in its relentless dissemination of Stolen Materials.

- The Motion is silent on the issue of why, over a three month period,  Respublika *pretended* to be complying with the Injunction (going so far as to surreptitiously backdate and repost various posts containing Stolen Materials), when it now claims it is manifestly not bound by the Injunction at all.  At the pre-motion conference, Respublika's New York counsel told the Court that the reason is that "they didn't have legal counsel . . . they were operating without counsel for a long time . . . ." (07/14/15 Tr. pp. 6, 8.)  Yet, Muratbek Ketebaev ("Ketebaev"), one of the key figures behind Respublika and husband of its founder and Editor, Irina Petrushova, has admitted in a published interview that legal counsel was consulted with respect to the Injunction on or before April 2, 2015—less than two weeks after the Injunction was issued.  (Semmelman Decl., Ex. 7; Voronov Decl., Ex. 20.)

- Finally, Ketebaev's connection to, and unstinting devotion to Mukhtar Ablyazov, a prime suspect in, and beneficiary of, the hacking who has been found by the UK High Court of Justice to have masterminded a multi-billion dollar fraud against BTA Bank,

raises additional, serious concerns about the relationship between Respublika and the hackers.

Consistent with Second Circuit precedent, the Court should order an evidentiary hearing to determine whether Respublika is acting in concert or participation with the hackers. In aid of that evidentiary hearing, Plaintiff requests the ability to take expedited discovery from Respublika, and is hereby cross-moving for that purpose.

Plaintiff respectfully requests that the Court hold in abeyance its decision on the Motion, grant Plaintiff's Cross-Motion for expedited discovery, and, upon completion of discovery, conduct an evidentiary hearing to decide the Motion on a fully developed evidentiary record.[2]

## Statement Of Facts[3]

### I.     The Hacking

Starting in or before August 2014, unknown persons hacked into the computer system of the Plaintiff, as well as into various email accounts used by Plaintiff's officials to conduct official government business. (ECF No. 006 at ¶¶ 7-8.) There have been a series of further hackings. (Semmelman Decl., ¶ 4.) The hackers stole untold numbers of sensitive, proprietary, confidential, and attorney-client privileged government documents (defined in the Injunction as the "Stolen Materials"). Plaintiff did not become aware of the hackings until approximately

---

[2] When Respublika (very belatedly) asserted the position that it is not bound by the Injunction, Plaintiff, unilaterally and without prejudice, offered to suspend, and indeed suspended, its efforts to enforce the Injunction against Respublika. This was done as a gesture of good faith, and pending discovery. The unilateral gesture was placed on the record July 14, 2015. (07/14/15 Tr. p. 14.)

[3] Respublika's Motion focuses largely on Plaintiff's alleged persecution of Respublika. While Plaintiff takes strong issue with Respublika's story, it is irrelevant to the issue before the Court, which is whether Respublika is acting in concert with the hackers. As discussed below, if Respublika is acting in concert with the hackers, it is bound by the Injunction.

January 21, 2015.  (ECF No. 006 at ¶ 7.)  The full extent of the hackings is still unknown.  (Semmelman Decl., ¶ 4.)

## II.      The Mega Archives

Over time, some hundred thousand documents of Stolen Materials, among other materials, were uploaded in a series of archives (the "Mega Archives" or the "Archives") on https://mega.co.nza, a website hosted by Mega Limited ("Mega"), a company based in New Zealand.[4]  (Graif Decl., ¶ 5.)

The posting of Archives on Mega was conducted in stages.  The first Archive was posted in August of 2014, and an additional 22 Archives have been posted on various occasions since then.  (Graif Decl., ¶ 6.)  Each of the 23 Archives corresponds to a particular custodian— apparently the person whose email account was hacked (the "Mega Custodians").  (Graif Decl., ¶ 6.)

In August of 2014, just prior to the first uploading of Mega Archives on Mega, unknown persons—either the hackers themselves, or persons working in concert with them—created the Kazaword Website.  Over time, as Archives of Stolen Materials were misappropriated by the hackers and uploaded on Mega, links to each of those Archives were placed on the Kazaword Website.  (Graif Decl., ¶ 8.)

The Kazaword Website served the mechanical function of providing links to the Archives of Stolen Materials stored on Mega.  The Kazaword Website did not describe or comment on the contents of the Stolen Materials, except in the most perfunctory manner.  The Kazaword Website did not post any information that would allow a visitor to discern what type of content was

---

[4] On May 21, 2015, Plaintiff filed a motion with this Court for the issuance of Letters Rogatory to the New Zealand High Court, to take discovery from Mega.  (ECF Nos. 018-21.)  That motion is currently pending.

available through the posted links.  (Graif Decl., ¶ 9.)  Visitors to the Kazaword Website could

only view emails by clicking on a link to one of the Mega Archives, and then downloading one

or more of the vast Archives of uncatalogued stolen emails—typically 8,000-12,000 emails per

Archive.  Because the Kazaword Website had very little textual material on it, anyone interested

in obtaining access to the Stolen Materials, but who was unaware of the Kazaword Website, was

unlikely to locate the Kazaword Website through a Google search.  Rather, in all likelihood, such

a person had to know of the existence of the Kazaword Website in order to find it.  (Graif Decl.,

¶ 9.)

**III.**     **Respublika's Dissemination of Stolen Materials,**
            **Including Some Not Obtained From The Kazaword Website**

To date, over 70 articles have been posted on the Respublika Website, containing over

150 emails from among the Stolen Materials.  (Semmelman Decl., ¶ 12.)   The Respublika

Facebook page, https://www.facebook.com/respublika.kaz.info, has also published posts that

contain Stolen Materials, including the posts that triggered this litigation.  (Semmelman Decl.,

¶ 12; ECF No. 024 at ¶ 4.)  Ketebaev has also published posts that contain Stolen Materials on

his personal Facebook page, https://www.facebook.com/mur.ketebayev.  (Semmelman Decl.,

¶ 12; ECF No. 024 at ¶ 4.)  In many instances, a post containing Stolen Materials has appeared

first on Ketebaev's Facebook page, and then has been reposted on Respublika's Facebook page.

(Semmelman Decl., ¶ 12.)

The vast majority of the Stolen Materials disseminated by Respublika and Ketebaev have

not been published by any news organization.  (Semmelman Decl., ¶ 13.)  While Respublika

asserts that the Stolen Materials it posted were obtained from the Kazaword Website (ECF No.

036 at pp. 1, 6), there are additional Stolen Materials that apparently have not been uploaded to

the Mega Archives, and therefore would not have been accessible through the Kazaword

Website.  (Graif Decl., ¶ 10.)  Some of these documents have been disseminated by Respublika. (Graif Decl., ¶ 10.)

For example, one of the emails from among the Stolen Materials contained in the February 11, 2015 Respublika Facebook post cited in the Motion for a Temporary Restraining Order is an email from Leila Shayakhmetova of Curtis to a Republic of Kazakhstan government official, enclosing a legal memorandum.  (Graif Decl., ¶ 11; Ex. 9.)  The Respublika Facebook post specifically states that the Stolen Materials in that post were "given to" Respublika. (Voronov Decl., Ex. 17.)  Indeed, Ms. Shayakhmetova is not a Mega Custodian, this email is not in any Mega Archives, and, as far as can be determined, was never available through the Kazaword Website.  (Graif Decl., ¶ 11.)

As another example, on February 5, 2015, Ketebaev posted on his personal Facebook page Stolen Materials consisting of emails and other documents sent to and from Vladimir Shkolnik, Minister of Energy.  (Graif Decl., ¶ 12; Ex. 10.)  Ketebaev wrote on his Facebook page that someone had "sent" him these documents a few days earlier.  (Voronov Decl., Ex. 18.)  The next day, the post appeared on the Respublika Website.  Mr. Shkolnik is not a Mega Custodian, these emails and documents are not in any Mega Archives, and, as far as can be determined, were never available through the Kazaword Website.  (Graif Decl., ¶ 12.)

In sum, the glib assurance in the Motion that Respublika found the Stolen Materials on the Kazaword Website is not correct.

## IV.     Respublika's Dissemination Of Other Illegally-Obtained Materials

The Stolen Materials are not the only illegally-obtained documents posted by Respublika and Ketebaev.  For example, Respublika has recently begun posting emails misappropriated from the account of Tamilla Karim, the daughter of the Prime Minister of Kazakhstan (who is not a Mega Custodian).  (Semmelman Decl., ¶ 15; Ex. 1.)

In another example, Ketebaev, through his personal Facebook page, and Respublika, through its Facebook page and through the Respublika Website, have linked to a series of lengthy articles about KazNET (a media conglomerate in Kazakhstan) titled "Who is behind KazNET?" (the "Articles").  (Semmelman Decl., ¶ 16; Ex. 2.)  Each of the Articles is authored by Ketebaev and contains dozens of emails.  (Semmelman Decl., ¶ 16; Voronov Decl., ¶ 4.)  Some of these emails appear to be illegally-obtained emails that are not Stolen Materials.  (Semmelman Decl., ¶ 16.)  The Articles represent yet another example of Respublika and Ketebaev publishing illegally-obtained materials that were never available through the Kazaword Website and that were necessarily obtained in other ways.  (Semmelman Decl., ¶ 16.)

Apparently speaking with regard to some of these other illegally-obtained materials, Ketebaev himself has stated publicly that "these published documents were given to me by people whose names I will not uncover under any circumstances."  (Semmelman Decl., ¶ 17; Ex. 3; Voronov Decl., Ex. 19.)

V.     **Respublika's Putative Compliance For Three Months
With The TRO And Injunction**

This lawsuit was precipitated by two posts on Respublika's Facebook page.  (ECF No. 006-1.)  The two posts contained Stolen Materials, specifically privileged communications between Plaintiff and its outside counsel (including the undersigned counsel).  Plaintiff filed its Complaint on March 12, 2015.  (ECF No. 001.)  On March 13, this Court issued a Temporary Restraining Order (the "TRO"), which ordered that "Defendants, their affiliates, employees, agents, and representatives, *and all persons acting in concert with or participating with Defendants*, are enjoined from using, disclosing, disseminating, posting, displaying, sharing, distributing, hosting, copying, viewing, accessing, providing access to or making available to anyone, in any manner whatsoever, the materials stolen by Defendants from the computer system

of Plaintiff and from the Gmail accounts of Plaintiff's officials (the 'Stolen Materials')."  (ECF No. 003.) (Emphasis added.)

Immediately after the Court issued the TRO on March 13, and pursuant to the Court's order regarding service of the TRO, counsel for Plaintiff posted "Comments" on Respublika's Facebook page, alerting Respublika to the Complaint and the TRO, and including a link to a special-purpose Facebook page Plaintiff's counsel created pursuant to the TRO that contained PDF copies of the Complaint, the TRO, and the supporting papers, *as well as contact information for the undersigned counsel*.  (ECF No. 008-1.)

By March 20, the two offending posts had been removed from the Respublika Facebook page.  (03/20/15 Tr. p. 3.)  On March 20, counsel for Plaintiff advised the Court of this favorable development, and noted that "there is a strong indication now that somebody received actual notice and in accordance with that took down the posts."  (03/20/15 Tr. p. 3.)  Plaintiff's counsel subsequently confirmed with Facebook that only the administrator of the Respublika Facebook page would have had the ability to remove those posts.  (Semmelman Decl., ¶ 6.)  From Plaintiff's perspective, this voluntary removal in direct response to the posting of the TRO confirmed that (a) someone at Respublika had read the TRO; and (b) Respublika considered itself bound by the TRO and was complying.

Although the Plaintiff's postings on the Respublika Facebook page provided notice to Respublika of the litigation and of the March 20, 2015 return date for the motion for a preliminary injunction, Respublika did not appear and did not submit any opposition to the motion.  (03/20/15 Tr. pp. 3-4.)[5]  The Court then converted the TRO into the Injunction, which

---

[5] In a "friend-of-the-court" letter to the Court dated August 14, 2015, the Reporters Committee for Freedom of the Press (the "RCFP") contends that "Respublika was given no notice and no

was consistent in material terms with the TRO.  (ECF No. 010 at p. 9).  Plaintiff's counsel promptly updated the special-purpose Facebook page created pursuant to the TRO, to include a copy of the Injunction.  (Semmelman Decl., ¶ 7.)

On April 6, 2015, Plaintiff's Comments (concerning the Injunction and this litigation) were removed by the administrator of the Respublika Facebook page.  (Semmelman Decl., ¶ 8.) That same day, Plaintiff re-posted the Comments, and they were removed again by the administrator of the Respublika Facebook page on April 7, 2015.  (Semmelman Decl., ¶ 8.)  At this time, the Comment feature was disabled.  (Semmelman Decl., ¶ 8.)

Respublika also resumed posting Stolen Materials on its Facebook page.  (Semmelman Decl., ¶ 9.)  On April 6, 2015, Plaintiff provided Facebook with a copy of the Injunction and asked that Facebook "abide by" the Injunction.  (Graif Decl., Ex. 12.)  Shortly thereafter, Facebook removed several posts from the Respublika Facebook page that contained Stolen Materials, and stated it was doing so based on Facebook's "policies."  (Graif Decl., Ex. 13.) Over approximately the next two months, the following process was repeated multiple times: Stolen Materials would be posted on the Respublika Facebook page or Ketebaev's personal Facebook page, Plaintiff would notify Facebook, and Facebook would typically take down the posts.  (Semmelman Decl., ¶ 10.)  At no time did Respublika notify Plaintiff's counsel that it did not consider itself bound by the Injunction.  (Semmelman Decl., ¶ 10.)

In addition to posting Stolen Materials on its Facebook page, Respublika was also posting Stolen Materials on its own website, http://www.respublika-kaz.info (the "Respublika Website"), which is hosted by IRC Company, Inc. d/b/a Black Lotus Communications ("Black Lotus"), a web host based in San Francisco.  (Semmelman Decl., ¶ 11.)

---

opportunity to oppose the preliminary injunction."  (ECF No. 039 at pp. 3-4.)  That is not correct. Indeed, Respublika itself makes no such claim.

While Respublika's initial takedown of its two posts in compliance with the TRO implied that Respublika considered itself bound by the TRO, the perception that Respublika was acting in concert or participation with the hackers was reinforced by the disclosure by Black Lotus that Muratbek Ketebaev is one of the "Primary Contact[s]" behind the Respublika Website.  (ECF No. 024-2.)  Ketebaev is openly allied with, and a confederate of Mukhtar Ablyazov, the criminal mastermind of a multi-billion theft from BTA Bank.  (ECF No. 023 at p. 12; ECF No. 024-6 at ¶¶ 88, 95; ECF No. 025-9.)  Ablyazov is a prime suspect in, and beneficiary of, the hacking.  (ECF No. 025, at ¶ 8; ECF No. 025-10.)

As set forth in detail in Plaintiff's pending motion for issuance of Letters of Request to Poland under the Hague Convention (ECF Nos. 022-27), the UK High Court of Justice has (to date) entered judgments in favor of BTA Bank and against Ablyazov in excess of $4.6 billion. (ECF No. 024-8 at ¶ 7.)  And, as further set forth in that motion, Ketebaev, inter alia, has been actively involved in obstructing the criminal investigation into the BTA Bank fraud and has been acting as nominee owner of assets beneficially owned by Ablyazov.  (ECF No. 023 at pp. 6-9.) Ketebaev is also married to Irina Petrushova, the founder and Editor of the Respublika Website. (07/14/15 Tr. at p. 19.)

On April 23, 2015, Plaintiff's counsel served Black Lotus with a copy of the Injunction and asked that Black Lotus "abide by" the Injunction.  (Graif Decl., ¶ 14; Ex. 14.)  On May 5, 2015, during a call with Mr. Warren Dewar, the Chief Financial Officer of Black Lotus, Mr. Dewar asked if the Injunction required a full shutdown of the Respublika Website.  (Semmelman Decl., ¶ 18.)  *Plaintiff's counsel said it did not*, and that to the extent there were posts that did not include Stolen Materials, *they were not subject to the Injunction*.  (Semmelman Decl., ¶ 18.)  Mr. Dewar said that as a technical matter, Black Lotus lacked the ability to take down individual

posts (only the entire website), but that Black Lotus would notify Respublika that it had to take down specific posts itself.  (Semmelman Decl., ¶ 18.)  On May 12, 2015, Mr. Dewar wrote Plaintiff's counsel that "[a]fter receiving the court order we had a conversation with our customer [i.e., Respublika] *who agreed to remove* the items on your list from their website.  I think that we are now in compliance."  (Semmelman Decl., Ex. 4.) (Emphasis added.)

Thereafter, on multiple occasions over a period of more than five weeks, Plaintiff's counsel notified Black Lotus of posts that contained Stolen Materials, which were taken down, apparently *by Respublika itself*.  (Semmelman Decl., ¶ 19.)  In total, Respublika itself took down 47 posts.  (Semmelman Decl., ¶ 19.)

On June 8, 2015, Plaintiff discovered that Respublika had backdated and surreptitiously reposted on the Respublika Website at least 27 posts substantially similar to posts containing Stolen Materials that Respublika had previously taken down.  (Semmelman Decl., ¶ 20.)  The scheme worked as follows:  Respublika would take down a post containing Stolen Materials.  Respublika would then covertly repost it (or a very similar one) on a page of the Respublika Website corresponding to a date in the past.  Only by checking older pages would anyone find the post.  Prior to June 8, Plaintiff had not been scrutinizing older pages.  Once Plaintiff caught on to the scheme, it became apparent that Respublika was engaging in a charade by making a show of taking down posts containing Stolen Materials in compliance with the Injunction, but then stealthily reposting essentially the same posts in a less overt way.  Yet again, Respublika's conduct reinforced the notion that it recognized itself as being bound by the Injunction, and that it was engaging in duplicitous activity to make it appear as if it was complying.  (Semmelman Decl., ¶ 20.)

On June 9, 2015, Plaintiff requested that Black Lotus take down the Respublika Website—something Plaintiff's counsel had expressly declined during the conversation with Black Lotus on May 5—as the only effective means of avoiding circumvention of the Injunction. (Semmelman Decl., ¶ 21.)  Black Lotus did not comply, but assured Plaintiff it would continue to have Respublika take down individual posts.  (Semmelman Decl., ¶ 21.)

On June 19, 2015, counsel for Plaintiff was contacted for the first time by counsel for Respublika and informed that it was Respublika's position that it was not bound by the Injunction.  (Semmelman Decl., ¶ 22.)  On a voluntary basis and without prejudice, Plaintiff's counsel immediately suspended enforcement efforts against Respublika (including with respect to the Respublika Website, the Respublika Facebook page and the Ketebaev Facebook page), pending discovery that will determine Respublika's role in the hacking and its involvement with the hackers.  (Semmelman Decl., Ex. 5; 07/14/15 Tr. pp. 16-17.)

Respublika's behavior over a three month period (March 13 – June 19) makes sense if Respublika was involved in the hacking or was in active concert or participation with the hackers, and thus recognized that it had to at least *pretend* to be complying with the Injunction.

Respublika has attempted to explain its conduct by having its New York counsel inform this Court that Respublika acted as it did because it lacked counsel.  Thus, at the pre-motion conference on July 14, 2015, Respublika's counsel stated:  "So, when they got this notification [in early May 2015] they didn't have counsel . . . And because they didn't have legal counsel, they were trying to deal with the legal situation halfway around the world from them, and so they thought they had to take these things down. . . . It's part of the problem that they were operating without counsel for a long time . . . ."  (07/14/15 Tr. 5-6; 8.)

Ketebaev, however, tells a very different story.  In a published interview dated April 2, 2015 (less than two weeks after the Injunction issued), Ketebaev admitted that "*we have been told by lawyers*" what the Injunction prohibited.  (Semmelman Decl., Ex. 7; Voronov Decl., Ex. 20.) (Emphasis added).

### VI.   Respublika Is Far And Away The Leading Publisher Of Stolen Materials

Respublika's counsel asserts that "other news organizations throughout the world have reported on" the materials on the Kazaword Website "and continue to report on them, regardless of whether Respublika is barred from publishing them."  (ECF No. 036 at p. 11.)

As an initial matter, the Stolen Materials are no longer available on the Kazaword Website, and have not been for the past three months.  (Graif Decl., ¶ 15.)  Contrary to Respublika's assertion that Plaintiff's counsel is solely targeting Respublika, on May 12, 2015, Plaintiff's counsel served Automattic, the web host for the Kazaword Website, with the Injunction and requested that it "abide by" the Injunction.  (Graif Decl., Ex. 15.)  Between May 22 and May 26, 2015, all of the links on the Kazaword Website were removed, and have not been reposted.  (Graif Decl., ¶ 15.)  Since May 26, the only content on the Kazaword Website is a message that states "NOTHING FOUND.  It seems we can't find what you're looking for.  Perhaps searching can help."  (Graif Decl., Ex. 16.)

With the links to the Mega Archives no longer posted on the Kazaword Website, there are no publicly available links to the Mega Archives.  (Graif Decl., ¶ 16.)  And, while a handful of documents from among the Stolen Materials have also appeared on other sites (ECF Nos. 37-49, 37-50), the principal posters by far of Stolen Materials are the Respublika Website, the Respublika Facebook page, and the Ketebaev Facebook page.  (Graif Decl., ¶ 16.)  Their systematic and ongoing publication of scores of articles containing Stolen Materials in the past

eight months – including over 70 articles on Respublika's Website alone – far exceeds all other

online dissemination of Stolen Materials.[6]  (Graif Decl., ¶ 16.)

### VII.    There Are Serious Questions About Respublika's Relationship With Ablyazov

Respublika's unstinting support for Mukhtar Ablyazov, the proven mastermind of the

theft of billions of dollars from BTA Bank, is telling.  Many of the hacked documents published

by Respublika relate to the legal cases against Ablyazov and against his known confederates

such as Alexandr Pavlov, his driver and henchman.  (ECF No. 006-1; ECF No. 023 at p. 10-11;

ECF No. 025, ¶¶ 6-8; ECF No. 025-10.)  Notwithstanding the fact that the UK High Court of

Justice has entered detailed factual findings and money judgments against Ablyazov and some of

his confederates in excess of $4.6 billion (ECF No. 024-8 at ¶ 7), Respublika has specifically

referenced Stolen Materials to assert that "Ablyazov didn't steal from the bank," and to condemn

the "key and extremely negative role [that] was played by government agencies of France,"

where the courts have found Ablyazov extraditable for his crimes.  (ECF No. 025, at ¶ 8; ECF

No. 025-10.)

Indeed, one of the only two non-Respublika posts cited in the Motion underscores the

connection between the hacking and the dissemination of Stolen Materials for the benefit of

Ablyazov.  *See* ECF No. 37-49 at p. 2 ("This gigantic leak (69 gigabytes) reveals the names in

France and elsewhere of leading personalities engaged to neutralize the political nuisance of the

billionaire banker" Ablyazov.)

Moreover, there are troubling reports in the press that Ablyazov is a financial backer of

Respublika.  *See, e.g.,* Ex. 6 (Anna Wołowska, *Wspólnota Kazachska*, March 1, 2010,

---

[6] Plaintiff has been monitoring and has therefore been aware of some other postings, such as the one in *Le Temps* cited by Respublika.  (ECF No. 37-50.)  No demand has been made to take down the posts. Plaintiff has no reason to suspect that publications such as *Le Temps* are in active concert with the hackers.  (Graif Decl., ¶ 17.)

*Kazakhstan: The president's son-in-law at the centre of a corruption scandal*) (discussing Ablyazov and "the Respublika newspaper that he finances").  If true, that would explain Respublika's steadfast devotion to Ablyazov.

*     *     *

As the foregoing demonstrates, an evidentiary hearing will be needed to resolve whether Respublika is in active concert with the hackers.  In aid of such a hearing, Plaintiff should be afforded the opportunity to take discovery from Respublika.  The principal issues to be explored would include:  (i) Respublika's relationship to the hackers and the hacking; (ii) how Respublika *actually* obtained the Stolen Materials; (iii) Respublika's involvement with other illegally-obtained materials; (iv) why Respublika pretended to comply with the Injunction for three months, going so far as to backdate posts to create the illusion of compliance; and (v) Respublika's relationship with Ablyazov.[7]  Plaintiff therefore respectfully requests that the Court defer decision on the Motion pending an evidentiary hearing, and that the Court authorize expedited discovery from Respublika in aid of such a hearing.

## ARGUMENT

### THE COURT SHOULD DEFER DECISION ON THE MOTION PENDING AN EVIDENTIARY HEARING AND SHOULD GRANT PLAINTIFF'S CROSS-MOTION TO TAKE DISCOVERY IN AID OF THAT HEARING

Without submitting any evidence, Respublika seeks a summary determination that it is not bound by the Injunction.  But if Respublika was involved in the hacking, or is in active concert or participation with the hackers, it is not entitled to the First Amendment protections afforded journalists who have not engaged in illegal activities to obtain information.  The pivotal issue of whether Respublika is in active concert or participation with the hackers necessitates an

---

[7] A proposed deposition notice under Fed. R. Civ. P. 30(b)(6) is submitted herewith as Exhibit 8 to the Semmelman Declaration.

-16-

evidentiary hearing.  The Court should therefore defer decision on Respublika's Motion and set this matter down for an evidentiary hearing.  In aid of such a hearing, the Court should grant Plaintiff's Cross-Motion for discovery.

> **I.**  **The First Amendment Does Not Protect The Publication Of Illegally-Obtained Materials Where The Publisher Is In Active Concert With Those Who Obtained The Materials Illegally**

Respublika's Motion is predicated on the factual assumption that Respublika was not involved in the hacking of Plaintiff's computers.  Respublika thus effectively concedes that if it was involved in the hacking, it is not entitled to First Amendment protection.[8]  Respublika has not, however, submitted any evidence—such as an affidavit from a competent witness— supporting its factual predicate.

Moreover, Respublika's concession does not go as far as it must:  as shown below, if Respublika is in *active concert or participation* with the hackers, it is not entitled to First Amendment protection.  All of Respublika's First Amendment arguments (including its argument on prior restraint), hinge on the factual assumption that Respublika is not in active concert or participation with the hackers.

None of Respublika's cited cases involved the situation in which the publisher was in active concert or participation with someone who obtained materials illegally.  Respublika relies heavily on *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979).  That case is inapposite.  A reporter witnessed a juvenile being arrested, and published the juvenile's name.  *Id.* at 99.  The reporter was convicted under a state statute that barred the publication of the names of juvenile offenders.  *Id.*  The Supreme Court held that "if a newspaper *lawfully obtains* truthful

---

[8] The RCFP similarly states that "[t]he foregoing suggests that the preliminary injunction does not enjoin Respublika from posting *documents it obtained legally*, or from reporting and commenting on the contents of those documents or the underlying facts."  (ECF No. 039 at p. 2.) (Emphasis added.)

information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Id*. at 103 (emphasis added).

Respublika's other cases are likewise inapposite, as none involves a situation in which a media entity engaged in unlawful conduct to obtain information. *See New York Times Co. v. Unites States*, 403 U.S. 713, 754 (1971) (Harlan, J., dissenting) (no indication that newspapers themselves had engaged in criminal activity, but merely that the documents "were purloined from the Government's possession and . . . the newspapers received them with knowledge that they had been feloniously acquired"); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1974) ("Appellee has not contended that the name was obtained in an improper fashion"); *Oklahoma Pub. Co. v. Dist. Court*, 430 U.S. 308, 311 (1977) ("There is no evidence that petitioner acquired the information unlawfully"); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 837 (1978) ("We are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it."); *The Florida Star v. B.J.F.*, 491 U.S. 524, 536 (1989) ("appellant lawfully obtained B.J.F.'s name"); *CBS Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, Circuit Justice) (in chambers) ("Even if criminal activity by the broadcaster could justify an exception to the prior restraint doctrine under some circumstances, the record . . . contains no clear evidence of criminal activity on the part of CBS, and the court below found none."); *United States v. Quattrone*, 402 F.3d 304, 313-14 (2d Cir. 2005) ("the facts of this case did not justify the imposition of a prior restraint or an infringement of appellants' right to publish information disclosed in open court").

By contrast, a media entity that participates in illegal activity to obtain information is not entitled to First Amendment protection. Even Respublika admits—as it must—that the First

Amendment has limits, and that it protects "innocent recipients" of illegally-obtained information.  (ECF No. 036 at pp. 1, 8.)

In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court addressed the issue of publication of illegally-obtained materials where the media publisher was *not* a participant in the illegal activity.  In concluding that such publication was protected under the First Amendment, the Court emphasized that the publishers "played no part in the illegal interception.  Rather, they found out about the interception only after it occurred, and in fact never learned the identity of the person or persons who made the interception."  *Id*. at 525.  Significantly, the Court went on to state:

> Our holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully. "It would be frivolous to assert – and no one does in these cases – that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws."

*Id*. at 532 n. 19 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 691 (1972)).

In a case cited in *Bartnicki*, the Fifth Circuit held that a journalist's *participation* in the criminal conduct of others abrogates the protections of the First Amendment, even if the journalist was not *directly* involved in the criminal activity.  In *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158 (5th Cir. 2000), *cert. denied*, 532 U.S. 1051 (2001), the neighbor of a school trustee illegally recorded the trustee's phone conversations, and took the recordings to a local radio station.  *Id*. at 164.  A reporter from the radio station met with the neighbor and discussed how best to preserve the recordings as well as how to make future recordings in a way that would minimize challenges to their authenticity.  *Id.*  The recordings were eventually returned to the neighbor, and were never aired directly on the radio, but the radio station broadcast three reports that the district court found constituted unlawful "disclosure" of confidential material on the

recordings.  *Id.* at 166.  The district court ruled, however, that the journalist's actions were protected by the First Amendment.  *Id.*  The Fifth Circuit reversed the district court's holding, reasoning that "defendants had some participation concerning the interception[.]"  *Id.* at 189, 193-94.

The Fifth Circuit decided *Peavy* after the Supreme Court had granted certiorari in *Bartnicki*.  The Fifth Circuit distinguished *Peavy* from the facts of *Bartnicki*, noting that "the media defendants in *Bartnicki*, unlike [those in *Peavy*] were *not* in any way involved with the interceptors." *Peavy*, 221 F.3d at 190 (emphasis in original).  In turn, the *Bartnicki* Court distinguished *Peavy* on the same rationale, namely, that "the media defendant in fact participated in the interceptions at issue."  *Bartnicki*, 532 U.S. at 522 n.5.[9]

The Injunction is based on violation of 18 U.S.C. § 1030, a criminal statute, and is consistent with Fed. R. Civ. P. 65 and with the principles set forth in *Bartnicki* and *Peavy*, namely, that a publisher who is in active concert or participation with someone who obtained materials illegally is not entitled to the protections of the First Amendment.  By its terms, the Injunction only applies to the hackers and those in active concert or participation with the hackers.[10]  (ECF No. 010, p. 9.)  It is therefore properly limited, and does not violate the First Amendment.[11]

---

[9] Eight days after the Supreme Court decided *Bartnicki*, it denied certiorari in *Peavy*.  *See WFAA-TV, Inc. v. Peavy*, 532 U.S. 1051 (2001).

[10] To the extent Respublika contends the Injunction is insufficiently clear to identify which documents are Stolen Materials, Plaintiff is prepared to further refine the definition of Stolen Materials to consist of those documents in the Mega Archives whose links are set forth in paragraph 7 of the accompanying Declaration of Michael R. Graif.  In the event additional Archives are posted on Mega, Plaintiff may move the Court to add such Archives to the definition of Stolen Materials.

[11] While Respublika complains about the proceeds disgorgement and document turnover provisions of the Injunction (ECF No. 036 at pp. 18-19), Plaintiff has not sought to enforce these provisions against Respublika.

II.     **Whether Respublika Is In Active Concert With The Hackers Needs
        To Be Resolved At An Evidentiary Hearing, And The Court Should
        Allow Discovery In Aid Of Such A Hearing**

    A.     **The Court Should Set This Case Down For An Evidentiary Hearing**

The factual record adduced to date raises serious questions about the nature and extent of

Respublika's involvement with the hacking and the hackers.  Among others, the following

questions have been raised:

- Respublika's relationship to the hacking and the hackers;

- How Respublika actually obtained the Stolen Materials, given that its stated
  explanation does not hold up;

- Respublika's involvement with other illegally-obtained materials;

- Why Respublika pretended to comply with the Injunction for three months, going so
  far as to backdate posts to create the illusion of compliance;

- Respublika's relationship with Ablyazov, a beneficiary of the hacking, if not a
  participant.

The factual questions should be resolved at an evidentiary hearing.  *See Vuitton et Fils

S.A. v. Carousel Handbags*, 592 F.2d 126 (2d Cir. 1979).  In *Vuitton*, a handbag manufacturer

had obtained an injunction that prohibited a company and anyone "acting in concert or

participation with it" from selling counterfeit handbags.  *Id*. at 128.  Plaintiff then learned that

counterfeit handbags were being sold in another store, which had overlapping ownership with the

enjoined entity, and plaintiff moved for contempt.  The issue was whether the owners of the

second store were acting in concert with the enjoined entity.  The district court refused to reach

that issue, finding that there was insufficient proof that some of the owners of the second store

had notice of the injunction.  On appeal, the Second Circuit reversed.  The court noted that

"[w]hether one not named in an injunctive decree may nevertheless be bound by it depends on

the facts of each case."  *Id*. at 130.  To prevail on its contempt motion, plaintiff was required "to

-21-

demonstrate that [each respondent] was acting in concert with" the enjoined entity. *Id*. at 129. But "[o]n the record before us, however, we are unable to ascertain the relationship between the two stores and consequently cannot determine if [the respondents] aided and abetted" the enjoined entity. *Id*. at 130. The Second Circuit held that the district court "should have held an evidentiary hearing to determine whether the [respondents] were bound by the injunction[.]" *Id*. at 129. The court reversed and remanded to the district court for an evidentiary hearing to determine, inter alia, whether the respondents had "acted in concert with" the enjoined entity. *Id* at 131.

As in *Vuitton*, the application of the Injunction in this case turns on the relationship between Respublika and the hackers who have been enjoined from disseminating the Stolen Materials, and whether or not Respublika is in active concert or participation with them. These issues should be resolved at an evidentiary hearing.

> **B.   The Court Should Allow Expedited Discovery**
> **In Aid Of The Evidentiary Hearing**

In aid of the evidentiary hearing, Plaintiff respectfully requests that the Court allow it to take expedited discovery from Respublika with respect to the issues to be determined at the evidentiary hearing.

Courts allow discovery in aid of preliminary injunction hearings. *See, e.g., American Broadcasting Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 376 (S.D.N.Y. 2012) (after "expedited discovery and briefing on the preliminary injunction motion, the Court held a two-day evidentiary hearing"); *Zeneca, Inc. v. Eli Lilly & Co.*, No. 99-1452, 1999 WL 509471, at *1 (S.D.N.Y. July 19, 1999) (Plaintiffs "moved for a preliminary injunction. Following extensive expedited discovery, the Court held a five-day evidentiary hearing."). Thus, while Respublika

asserts that Plaintiff cannot satisfy the preliminary injunction standard (ECF No. 036 at pp. 10-13), Plaintiff should not be required to do so without discovery.

Courts apply one of two standards when analyzing requests for expedited discovery. *See Litwin v. OceanFreight*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011). The first is a "reasonableness" standard. *Id.*; *see also Keybank Nat'l Assoc. v. Quality Pay-Roll Sys., Inc.*, No. 06-3013 (JS), 2006 WL 1720461, at *4 (E.D.N.Y. Jun. 22, 2006). Plaintiff's requested discovery meets the "reasonableness" test. The discovery requests go to heart of this dispute, namely, determining Respublika's connection to the hacking, and if Respublika was acting in concert or participation with the hackers. The requests are reasonable.

The other standard is the four-part showing set forth in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), which requires that the proponent of discovery show: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted." *Id.* at 405. Applying both tests, this Court has previously authorized third party discovery to identify the Does. (03/20/15 Tr. pp. 6-9.)

Plaintiff's requested discovery meets the *Notaro* standard. First, Plaintiff has suffered, and will continue to suffer "certain and imminent harm for which a monetary award does not adequately compensate" as a result of the continued posting of confidential Stolen Materials. *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101,113 (2d Cir. 2003). This Court has already made a determination of irreparable harm. (ECF No. 010 at p. 6.) The irreparable harm is exacerbated now that the links to Stolen Materials have been removed from

the Kazaword Website, so that each additional posting by Respublika of documents from among the Stolen Materials likely constitutes the *only* publication of those specific documents.

Second, even if Plaintiff must prove a likelihood of success against Respublika in order to apply the Injunction to it, Plaintiff is not required to make such a showing without discovery. *See, e.g.*, *American Broadcasting Companies*, 874 F. Supp. 2d at 376.  At a minimum, since the standard for allowing discovery is merely "some probability of success on the merits," *Notaro*, 95 F.R.D. at 405, the significant questions regarding Respublika's involvement with the hackers are sufficient to meet that standard.

Third, there is more than "some connection" between the expedited discovery sought and the avoidance of irreparable injury to Plaintiff.  *Notaro*, 95 F.R.D. at 405.  Expedited discovery would determine Respublika's connection to the hacking, ultimately adjudicating whether Respublika is bound by the Injunction.  This determination will minimize future irreparable harm to Plaintiff.

Fourth, there is more than "some evidence" that the injury that will result without expedited discovery looms greater than the injury Respublika will suffer if expedited discovery is authorized.  *Notaro*, 95 F.R.D. at 405.  As of now, Respublika is continuing to post documents from among the Stolen Materials.  Requiring Respublika to submit to focused discovery in the form of a Fed. R. Civ. P. 30(b)(6) deposition (Ex. 8) should not be deemed injury sufficient to override the irreparable harm to Plaintiff.

### C.       Respublika Cannot Bar All Discovery By Invoking The Reporter's Privilege

The reporter's privilege would not bar all discovery.  At a minimum, the privilege would have to be invoked with respect to individual questions.  *See In re Chevron*, 736 F. Supp. 2d 773, 781 (S.D.N.Y. 2010) (rejecting blanket claim of journalistic privilege and requiring journalist to demonstrate "that the privilege applies to particular documents or information").

Moreover, the reporter's privilege does not apply to non-journalistic activities. *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) ("This circuit has long recognized a qualified evidentiary privilege for *information gathered in a journalistic investigation*.") (citations omitted) (emphasis added). Thus, discovery into Respublika's connections to the hacking, and whether it is in active concert or participation with the hackers, would not be shielded by the reporter's privilege.

For all of these reasons, the Court should enter an order setting this case down for an evidentiary hearing to determine whether Respublika has been acting in concert or participation with the hackers, and should allow discovery in aid of the hearing.

## CONCLUSION

For the foregoing reasons, the Court should hold in abeyance its decision on the Motion, grant Plaintiff's Cross-Motion for expedited discovery, and, upon completion of discovery, conduct an evidentiary hearing to decide the Motion on a fully developed evidentiary record.

Dated: New York, New York
   August 25, 2015

       Respectfully submitted,

       CURTIS, MALLET-PREVOST,
        COLT & MOSLE LLP


       By:   */s/Jacques Semmelman*
        Jacques Semmelman (JS 5020)
        jsemmelman@curtis.com
        Michael R. Graif (MG 4795)
        mgraif@curtis.com

       101 Park Avenue
       New York, New York 10178
       (212) 696-6000

       *Attorneys for Plaintiff The Republic of Kazakhstan*