1

F7E8REPC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   THE REPUBLIC OF KAZAKHSTAN,

4                  Plaintiff,

5           v.                            15 Cv. 1900 (ER)

6   DOES 1-100 INCLUSIVE,

7                  Defendants.

8   ------------------------------x

9                                    July 14, 2015
                                     11:45 a.m.
10
    Before:
11
                       HON. EDGARDO RAMOS
12
                                      District Judge
13
                         APPEARANCES
14
    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
15       Attorneys for Plaintiff
    BY:  JACQUES SEMMELMAN
16       MICHAEL R. GRAIF

17  DAVIS WRIGHT TREMAINE, LLP
         Attorneys for Nonparty Respublika
18  BY:  JAMES ROSENFELD

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

F7E8REPC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3   appearances.

4          MR. SEMMELMAN:  For plaintiff, Jacques Semmelman,

5   Curtis, Mallet-Prevost, Colt & Mosle, and with me is my

6   partner, Michael Graif.

7          THE COURT:  Good morning, Mr. Semmelman and

8   Mr. Graif.

9          MR. ROSENFELD:  Good morning, your Honor.  Jim

10   Rosenfeld, Davis Wright Tremaine.  I am counsel for a nonparty,

11   Respublika.

12          THE COURT:  Good morning to you, Mr. Rosenfeld.

13          Mr. Rosenfeld, we are here at your request I know, but

14   let me start with Mr. Semmelman.  Give me a status, if you

15   will.  And you can remain seated.  Just make sure to speak

16   directly into the microphone.

17          MR. SEMMELMAN:  Thank you, your Honor.

18          The status is as follows.  As your Honor probably is

19   aware, we have two motions pending before the Court to take

20   discovery.  One is to take the deposition of Mr. Muratbek

21   Ketebaev in Poland, and the other is to obtain documents from

22   an entity called Mega, which is based in New Zealand.  Those

23   motions are currently pending before the Court.

24          So I am taking the opportunity, respectfully, to

25   remind the Court that they are pending, and we would hope that

F7E8REPC

1   when the Court is able to turn its attention to it and sees fit

2   to grant it, we will then be able to proceed in those

3   directions to obtain discovery that we are optimistic will

4   enable us to obtain a lot more information to help us identify

5   who is involved in the hacking that is the subject matter of

6   this lawsuit.

7           In addition, we have served some subpoenas, and we

8   have gotten some document production.  We are discussing with

9   some of the subpoenaed entities whether or not we will receive

10   additional document production, but we have gotten some

11   documents, and we are following the leads that those documents

12   have provided.

13           So, that is the status of the matter as it now stands.

14           THE COURT:  So, Mr. Rosenfeld, tell me about your

15   client's involvement thus far.

16           MR. ROSENFELD:  Sure, your Honor.  Our client is not

17   named as a defendant.  As you know, all of the defendants are

18   John Does.  And it's not named in the preliminary injunction

19   papers.  Essentially, plaintiff, Republic of Kazakhstan, is

20   using the injunction to have Internet service providers that

21   host the Web versions of my client's newspaper and their social

22   media Facebook taken down, have certain articles taken down,

23   and they have threatened to have the entire site taken down

24   from a server called Black Lotus.

25           THE COURT:  So your client is a newspaper, a hard-copy

4

F7E8REPC

1   newspaper?

2           MR. ROSENFELD:  It was a hard-copy newspaper.  It's

3   now only online.  And what has happened over the last year,

4   since about 2002, is a campaign of threats.  The government of

5   Kazakhstan, when they were still in the country, have made

6   threats against the newspaper Respublika, including delivering

7   a skull to one person and delivering a headless dog carcass to

8   another person, various threats, and eventually their offices

9   were fire-bombed.

10          THE COURT:  This is where?

11          MR. ROSENFELD:  This is in Kazakhstan.

12          THE COURT:  In Kazakhstan?

13          MR. ROSENFELD:  Yes, when they were still in

14   Kazakhstan, and eventually run out of the country.  They were

15   convicted of various crimes on false pretenses.  They were run

16   out of the country and are now publishing from exile in other

17   countries.  They have continued, despite that, to put out the

18   leading opposition paper in the country that's critical of the

19   government.  And they have received various awards in

20   recognition for their reporting on the government, from groups

21   like Committee to Protect Journalists.  They won the

22   International Press Freedom Award from that group.  The

23   editor-in-chief has testified before the UN, before various

24   federal legislatures, about the human rights abuses that have

25   been inflicted against them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7E8REPC

```
1              They are still publishing.  And even as they are

2      abroad, they have been the victims of various attacks

3      electronically on their servers, and they have had to move

4      around from one server to another, and also to publish on

5      Facebook, which is the only way they have been able to publish

6      to residents of Kazakhstan.  But their circulation is

7      international.  They are the leading opposition voice on

8      Kazakhstan's politics and government.

9              THE COURT:  As regards to this particular case, Mr.

10     Semmelman tells me that there has been some course of conduct

11     between your clients and his client during which, at least at

12     the beginning, your clients were voluntarily agreeing to take

13     down certain purportedly stolen documents, and came a point

14     that you decided, OK, we are not doing this anymore, we are

15     asserting our First Amendment rights.

16             Is that all accurate?

17             MR. ROSENFELD:  In part.

18             THE COURT:  So tell me what happened.

19             MR. ROSENFELD:  What happened was the plaintiff got

20     its injunction in this court, took it to enforce it against

21     these servers.  Black Lotus is the main one, and then, also,

22     there has been the subpoena to Facebook.  Then the servers tend

23     to notify the users when they receive a third-party request of

24     any kind.

25             So, when they got this notification, they didn't have
```

F7E8REPC

1    counsel.  They did agree to take things off of their sites, but

2    only because they thought that their site was going to be taken

3    down completely.  And because they didn't have legal counsel,

4    they were trying to deal with the legal situation halfway

5    around the world from them, and so they thought they had to

6    take these things down.

7            THE COURT:  Where is Black Lotus, or does it matter?

8            MR. ROSENFELD:  Black Lotus is, I believe, in

9    Washington state.  Is it Washington or California?

10           MR. SEMMELMAN:  It's in California, your Honor.

11           THE COURT:  OK.  So what is the relationship between

12   your client and Black Lotus?

13           MR. ROSENFELD:  The only relationship is a business

14   relationship.  They hosted our client's Web site.

15           THE COURT:  So if I wanted to read Respublika, I would

16   go to a Black Lotus location?

17           MR. ROSENFELD:  You would go to Respublika's Web site,

18   but the servers on which the site exists are hosted by Black

19   Lotus.

20           THE COURT:  So I would go to Respublika.com, and I

21   would be sent to a Black Lotus server?

22           MR. ROSENFELD:  That's correct.

23           As I said, they had to move around some.  The reason I

24   made the mistake of Washington versus California is they also

25   published at one point through another provider called eNom,

7

F7E8REPC

1     which I believe is in Washington state, and has been subject to

2     discovery requests by the Republic of Kazakhstan in a separate

3     litigation taking place in California.  And they have also, as

4     I said, had to publish a lot of what they published through

5     Facebook in order to reach an audience within Kazakhstan that

6     is blocked from reaching these other sites.

7             THE COURT:  Kazakhstan allows Facebook?

8             MR. ROSENFELD:  That's my understanding.

9             THE COURT:  What was it that Kazakhstan asked you to

10    take down pursuant to the injunction?  Were they articles or

11    were they the documents themselves?

12            MR. ROSENFELD:  Kazakhstan didn't make any request

13    directly to us, just to Black Lotus, just to, I believe,

14    Facebook.  The request to Black Lotus, for instance, they

15    requested at least 47 articles that we are aware of from

16    Respublika's site be taken down.  And in a separate letter,

17    that they should have to take down the entire site if they

18    didn't comply with this order.

19            So, a lot of these articles did have, or write about

20    at least, materials that we believe are what plaintiff calls

21    the stolen materials.  Some of them did not and were articles

22    that were about the government, perhaps critical, but not

23    involving stolen materials.  But I think most of them, a vast

24    majority of them, did deal with materials that came to light,

25    which were materials that, to be clear, your Honor, we did not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

F7E8REPC

1    steal.

2            THE COURT:  I understand.

3            MR. ROSENFELD:  That a third party unrelated to us

4    posted, or someone posted on this blog called, I believe it's

5    KazaPress.  Like many others in the media, we found the

6    materials there and reported on them.

7            THE COURT:  I guess my question is, did you also

8    publish the materials themselves on your Respublika site?

9            MR. ROSENFELD:  I am not aware that we did.  I am sure

10   counsel will correct me if I am wrong.  I am still relatively

11   new to this case.  It's part of the problem that they were

12   operating without counsel for a long time, and we have gotten

13   involved in the last few weeks.  I think they were mostly

14   articles reporting on the materials.  I am not sure that they

15   ever reprinted verbatim the materials, but I defer to counsel

16   if I am misspeaking on that.

17           THE COURT:  Let me just ask you.  If they were, would

18   your position change?

19           MR. ROSENFELD:  Absolutely not.

20           THE COURT:  Now, Mr. Semmelman in his letter suggests

21   that he is trying to work this out with you, and if in fact

22   they are asking to do something which is beyond the scope of

23   the injunction, or if they are asking your clients to do

24   something which would violate their First Amendment rights,

25   then they are willing to take a look at that.  Is that an

F7E8REPC

1   accurate state of the current state of play?

2          MR. ROSENFELD:  Yes, and I appreciate the effort.  My

3   client's position is that any cessation of this activity would

4   have to be permanent and court ordered, not unilateral and up

5   to Kazakhstan whether and when to resume, which I believe is

6   what they have suggested.  Particularly, given the long history

7   of what has happened between Kazakhstan and this opposition

8   newspaper, even the possibility of resuming the course of

9   dealing of going to third parties and having articles

10  de-published will have a chilling effect and violate the First

11  Amendment rights of Respublika.

12          We don't believe that the preliminary injunction

13  should be applied to our client.  It's a member of the media.

14  To the extent it is being applied, we don't believe that when

15  the preliminary injunction was obtained, Kazakhstan established

16  either a likelihood of success or irreparable harm as to our

17  client, and we don't believe that it could.  We think that any

18  enforcement of the injunction in the way that it's being forced

19  against them violates the First Amendment for the multiple ways

20  that I set forth in my letter.

21          THE COURT:  Mr. Semmelman.

22          MR. SEMMELMAN:  Thank you, your Honor.

23          I want to start by observing that Mr. Rosenfeld did

24  not mention two very important facts.  Number one, his client

25  has been shown to have backdated posts after they were

F7E8REPC

1    supposedly taken down.  Mr. Rosenfeld's client Respublika

2    restored some of them, but on a backdated basis, hoping nobody

3    would find them.

4          THE COURT:  What does that mean?  What did they do

5    specifically?

6          MR. SEMMELMAN:  Let me back up a little bit, your

7    Honor.

8          We provided notice to Respublika on their Facebook

9    page the day the Court issued the TRO, which was March 13.  And

10   within the text of the TRO there were provisions for providing

11   notice.  We complied in full and one of those provisions

12   included posting notice of the TRO on the Respublika Facebook

13   page, because what triggered this entire litigation really was

14   that Respublika on its Facebook page had posted certain

15   privileged communications between my law firm, Curtis Mallet,

16   and our client, the Republic of Kazakhstan.  That's what got

17   the ball rolling, so to speak.

18         We posted the notice of the TRO, and within a matter

19   of approximately five days, the two offending posts had been

20   taken down.  We were back in court a couple of days after that.

21   I reported that to the Court and it's on the record.  So

22   initially we saw what appeared to be compliance by whoever is

23   behind Respublika.

24         Things did not quite proceed as smoothly as that

25   afterwards, and we interacted with Facebook.  When stolen

F7E8REPC

1    materials were being posted, Facebook took things down.  We

2    never heard for a period of three months from Respublika.  Now,

3    they knew who we were because we posted our contact

4    information, my personal contact information, on the Respublika

5    Facebook Web page, as directed by the Court.  They knew how to

6    reach me.  They certainly knew how to reach the Court.  There

7    was radio silence for three months and purported compliance.

8    So Facebook would take things down at our request.  We heard

9    nothing from Respublika.

10          Then we began to see that there were verbatim

11    photographs of stolen materials.  Not just summaries or

12    discussions of the stolen materials.  So actual reproductions

13    of the stolen materials that were being posted on the

14    Respublika Web site, in addition to its Facebook page, but now

15    we are talking about the Web site.  And the host for that Web

16    site is company Black Lotus in California.

17          We notified Black Lotus that there is a preliminary

18    injunction.  We delivered it to them.  And that was on April

19    23rd.  On May 5, I had a conversation with a gentleman named

20    Warren Dewar at Black Lotus, and he specifically asked me if

21    the preliminary injunction requires a shutdown of the entire

22    site.  And I told him, No -- he is the chief financial officer

23    by the way.  I told him, No, it does not require a shutdown of

24    the entire site.

25          THE COURT:  The entire Respublika site.

F7E8REPC

1          MR. SEMMELMAN:  Correct.  That was Mr. Dewar's

2     question to me.  I said, No, you don't have to shut down the

3     whole site based on this injunction.  It's specific posts that

4     contain the stolen materials.

5          Then, on May 12, a week after that conversation,

6     Mr. Dewar sent us an e-mail in which he said, "After receiving

7     the court order, we had a conversation with our customer --

8     namely, Respublika -- who agreed to remove the items on your

9     list from their Web site."

10         So, Respublika agreed to take posts down, and for

11    several weeks they continued to take posts down.  Respublika

12    took the posts down.  Sure, it was at our request, but they did

13    it themselves.

14         Then on June 8, it came to our attention that after

15    taking down these posts, Respublika was backdating at least

16    certain ones and reposting them with an earlier date, obviously

17    in an attempt to prevent us from noticing because who has time

18    to go back through many archives.  We were proceeding on a

19    day-by-day basis, not going back in time.  But at some point we

20    did, and we spotted it.

21         Then we notified Black Lotus that this was going on,

22    and we said, Look, we have no choice at this point but to ask

23    you to take down the whole site, because if there is going to

24    be circumvention, what choice do we have?  Black Lotus did not

25    take down the site, but they agreed to continue to remind or to

F7E8REPC

1    request their client Respublika to continue to take down

2    individual posts.  Then on June 19, I received my first contact

3    from Mr. Rosenfeld.

4         So, we have three months of conduct, which what I am

5    hearing now is to be excused or explained away on the basis,

6    well, they didn't have counsel.  Well, they are a media

7    organization.  Presumably, they have some sophistication.  It's

8    hard to understand how for three months they were complying, in

9    a manner of speaking, but circumventing the compliance at the

10   same time, all because they didn't have counsel.

11        Where we seem to be headed, your Honor, is we are

12   going to need discovery to understand what really went on here.

13   I understand Mr. Rosenfeld is a fine gentleman.  He is telling

14   the Court what he believes happened.  We are going to need some

15   discovery from people with knowledge, from percipient

16   witnesses, to really understand what happened here.  Because

17   for three months Respublika acted as if they believed

18   themselves to be bound by this injunction, and in a display of

19   consciousness of guilt, they then did the backdating stunt.

20        I don't know what to make of all of that, other than

21   we are going to need discovery to figure out what is really

22   going on here.  And once we have had discovery, we can come

23   back to the Court and report back and see where we are on the

24   discovery, whether we have enough discovery to close the loop,

25   whether we need an evidentiary hearing to finish it off.  I

F7E8REPC

1    don't know yet.  But those are the things that I am suggesting.

2              Now, during the period of the discovery, we have

3    offered, and we continue to offer, to refrain on a voluntary

4    basis from enforcing the injunction against Respublika, and to

5    do so on the record so that it's not just our whim.  It's going

6    to be on the record that on a voluntary, without prejudice

7    basis, we are prepared to agree to refrain from enforcing the

8    injunction against Respublika during the pendency of the

9    discovery, at the conclusion of which we will come back to the

10   Court and we will see where we are.

11             THE COURT:  Mr. Rosenfeld.

12             MR. ROSENFELD:  My first response to that is I don't

13   know the facts about the allegations of backdating.  Mr.

14   Semmelman said he heard from me first on June 19.  I think I

15   was engaged around June 15.

16             Let me put that aside for a second.  The most

17   important thing I want to say is that I don't think any of that

18   goes to the issue I am raising of the constitutionality of

19   applying this preliminary injunction against a media entity

20   that is reporting on political events and government events

21   going on in Kazakhstan.

22             I do know that whatever happened happened before my

23   watch.  I actually do think it is a very legitimate excuse, if

24   you want to call it an excuse, that they didn't have counsel.

25   They are living in exile.  It is very difficult even for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7E8REPC

1   counsel to communicate with them because they are very

2   concerned about their security, they are concerned about their

3   lives, and they have more pressing things to deal with, in

4   their view, at home and in Kazakhstan than dealing with a legal

5   dispute in the United States.

6           Of course, it is very important to them, and once they

7   spoke to counsel, we talked about it and decided to proceed the

8   way we have.  But the backdating doesn't affect the importance

9   of not applying the preliminary injunction in an

10  unconstitutional way.  As I said before, my client's position

11  is that a temporary cessation is not sufficient to undo the

12  chilling effect of having this conduct reinstituted by

13  Kazakhstan.

14          THE COURT:  Mr. Semmelman, you have not addressed the

15  First Amendment issues, and quite honestly, I am concerned

16  about them.  This does put a different color on the injunction.

17  It seems to me that Mr. Rosenfeld and his clients raise very

18  important issues that do deserve further consideration by the

19  Court.  And although I do appreciate your client's willingness

20  to voluntarily defer from enforcing the injunction -- by the

21  way, I don't know that, pursuant to the injunction that I

22  issued, that you can call an Internet services provider and

23  direct them to shut down an entire Web site.  I don't know that

24  you can do that without coming to me first.  In any event, I am

25  inclined to grant Mr. Rosenfeld's request to move to amend the

F7E8REPC

1    injunction in order to take account of the very important First

2    Amendment issues that he has raised.

3         MR. SEMMELMAN:  First of all, just to address your

4    Honor's comment about the shutdown issue.  The injunction

5    prohibits hosting of stolen materials.  Black Lotus is a host.

6    And as long as the injunction was being complied with through

7    the takedown of specific posts of stolen materials, that was

8    not raising any issue.  But when Black Lotus was in the

9    position that they would be hosting a Web site that contained

10   stolen materials, that raised the issue of how to comply with

11   the injunction, and that's why we ended up where we were.  But

12   ultimately Black Lotus did not take down the site.  So the

13   issue right now is not really an issue on the table.

14        THE COURT:  Let me ask you, do you have reason to

15   dispute the status of Respublika as a legitimate bona fide

16   media organization that is entitled to First Amendment rights?

17        MR. SEMMELMAN:  I have reason to question whether or

18   not they were involved with the hacking and the hackers.  In

19   other words, Mr. Rosenfeld has said they had nothing to do with

20   it.  I understand Mr. Rosenfeld is counsel, but he is not a

21   witness.  It seems to me that the issue of whether or not they

22   should be treated as a legitimate member of the media hinges on

23   whether or not they had involvement and are in active concert

24   and participation with the hackers and the hacking.  Because if

25   they had nothing to do with it, I would say sure.  And that's

F7E8REPC

1    why we are suspending our efforts voluntarily, because if it

2    turns out that what we are hearing today is true and that

3    discovery confirms that, then we agree, they should not be

4    subject to having to take anything down.  Because if they had

5    nothing to do with the hacking, if they are not in active

6    concert with the hackers, so be it.  But that's the big

7    unanswered question here.

8           And looming behind all this is Mr. Ketebaev.  This is

9    the man in Poland that we want to depose.  He is one of the key

10   people behind Respublika.  Well, that certainly raises a lot

11   more questions in our mind.

12          THE COURT:  What do you mean he is one of the key

13   people behind Respublika?

14          MR. SEMMELMAN:  Black Lotus itself produced a document

15   which lists Mr. Ketebaev as one of the primary contacts for

16   Respublika, for the Respublika site.  So he is intimately

17   involved with Respublika.  We don't know exactly how, but we

18   know that he is listed as one of the primary contacts in the

19   files of Black Lotus.  The document is in the court record in

20   the Ketebaev Poland motion, and we cited to it in our letter to

21   the Court dated June 30.

22          That certainly raises a big question:  What is

23   Ketebaev's involvement here?  Given that he has so many

24   tentacles in the story, as we have laid out in our motion for

25   discovery in Poland, now he is behind Respublika, or one of the

F7E8REPC

1    key people behind Respublika.  What is that all about?  Well,

2    until we can get some discovery, we are not going to know.  And

3    the answer to your Honor's question about the First Amendment

4    is going to hinge on that.  Because if Ketebaev and whoever is

5    working with him at Respublika were part and parcel of the

6    group that organized, planned, implemented, and financed the

7    hacking, then they should not be entitled to First Amendment

8    protection.

9           On the other hand, if they really weren't involved

10   with any of this and came along afterwards -- as Mr. Rosenfeld

11   said in his letter, Respublika found the documents the same way

12   the rest of the world did, after 69 gigabytes of documents were

13   anonymously posted to kazaword.wordpress.com -- if that's

14   really true, then we would concede.  If they had nothing to do

15   with the hacking, and if they are not in concert, so be it, we

16   would accept that.

17          But right now there are a lot of question marks, given

18   Mr. Ketebaev's involvement in all of this, given the behavior

19   that I understand is sought to be whitewashed or explained away

20   with a wave of a hand and say, well, they didn't have counsel.

21   I think we should be entitled to discovery before any decision

22   is made.

23          MR. ROSENFELD:  Your Honor, a couple of things,

24   please.

25          First of all, I agree neither of us can testify here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7E8REPC

1    We are stating our understanding of the facts.  My

2    understanding of fact is that Mr. Ketebaev is married to Irina

3    Petrushova, who is editor and principal of Respublika.  I am

4    not aware of any involvement that he has in the newspaper.  My

5    understanding is that she runs the newspaper, and he is a

6    political opposition figure in Kazakhstan; both have been very

7    publicly in opposition to the government.

8            As far as Mr. Semmelman's statements about taking

9    discovery first, they are entitled to take discovery if they

10   want.  I think that the Court's inclination to modify the

11   preliminary injunction is the reasonable course, and is

12   required constitutionally for all the reasons I have set forth,

13   and the injunction is at this point a preliminary injunction so

14   it is temporary.  I don't think that the Republic of Kazakhstan

15   should be able to go forward and seek discovery against my

16   client, unless it has established likelihood of success of its

17   claims against my client and irreparable harm, and the other

18   preliminary injunction requirements, specifically, as to my

19   client.  And they haven't done that.  That's their burden to

20   do.  It's obviously a form of extraordinary relief.  And the

21   preliminary injunction should be modified so they have to do

22   that before they can enforce it against my client.

23           THE COURT:  I think the way I would want to proceed,

24   Mr. Rosenfeld, is to grant you leave to make the motion and

25   then we will proceed in that fashion, and we can do this on a

F7E8REPC

1     fairly expedited basis, I suppose as fast as you folks want to

2     go.  So when do you want to put in your papers?

3              MR. ROSENFELD:  First, our interest is in doing it

4     quickly.  I will propose a date when we can get our papers in.

5     I would ask the Court, at least, if we could memorialize

6     somehow -- plaintiff is on record here agreeing not to enforce

7     in the meantime, and I hope that will continue until the motion

8     is decided.

9              THE COURT:  Mr. Semmelman has said so on at least two

10    occasions.  He is a member of the bar of this court.  As far as

11    I know, his word is good.

12             MR. ROSENFELD:  That's fine with us.  And I know Mr.

13    Semmelman personally, and I don't have any reason to doubt

14    that.  I just wanted to make sure that was still on the table

15    if we are going through the motion process.

16             We could have a motion filed within three weeks, your

17    Honor.

18             THE COURT:  Mr. Semmelman, to respond?

19             MR. SEMMELMAN:  If they are taking three weeks, I

20    guess we will ask for three weeks as well.

21             THE COURT:  Very well.

22             Ms. Rivera.

23             THE DEPUTY CLERK:  The motion will be due on August 4,

24    2015.  And the response will be due August 25, 2015.

25             THE COURT:  Mr. Rosenfeld, if you want to reply, you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F7E8REPC

1   can do that within a week after that.

2           MR. ROSENFELD:  Thank you, your Honor.

3           THE DEPUTY CLERK:  September 1, 2015.

4           THE COURT:  Once I take a look at the papers, we will

5   determine a hearing date.

6           Let me ask another question.  Is Black Lotus the

7   exclusive site on which these documents are currently available

8   or are there others?

9           MR. SEMMELMAN:  Some documents have been available on

10  other sites in various parts of the world.  We have focused our

11  energies on those sites that we believe, or we suspect at

12  least, are connected in some way to the hackers, either through

13  Mr. Ketebaev or otherwise.

14          We have tried to be focused in our enforcement

15  efforts.  For example, there was a posting about three to four

16  weeks ago on the Web site of a Swiss newspaper.  We didn't

17  start up with them because, to the best of our knowledge, they

18  are not connected to Mr. Ketebaev, or at least not overtly.  We

19  let them go.  We didn't take them on because we had no reason

20  to suspect that they are in league with anybody connected with

21  the hacking.

22          So, Respublika has certainly posted the lion's share

23  of stolen material that has gone up, but here and there there

24  have been other postings, and we have generally assessed

25  whether or not we thought they were connected to the hackers,

F7E8REPC

1    and if we don't think they are connected to the hackers, we

2    leave them alone.

3            THE COURT:  Very well.  Is there anything else that we

4    need to do today?

5            MR. SEMMELMAN:  Not from our end.

6            MR. ROSENFELD:  No, your Honor.

7            THE COURT:  Very good then.  We are adjourned.

8            Thank you, folks.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25