```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                           Docket #15cv1900
THE REPUBLIC OF KAZAKHSTAN,         :

                    Plaintiff,      :

    - against -                     : New York, New York
                                      October 28, 2015
DOES 1-100,                         :

                    Defendants.     :

------------------------------------ :
```

```
                    PROCEEDINGS BEFORE
                 THE HONORABLE HENRY PITMAN,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
```

APPEARANCES:

```
For Plaintiff:            CURTIS, MALLET-PREVOST, COLT &
                             MOSLE LLP
                          BY: JACQUES SEMMELMAN, ESQ.
                              MICHAEL MOSCATO, ESQ.
                          101 Park Avenue South, 35th Floor
                          New York, New York 10178


For Non-Party Respublika: DAVIS WRIGHT TREMAINE LLP
                          BY: JAMES ROSENFELD, ESQ.
                          1633 Broadway
                          New York, New York 10019
```

```
Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone: (212) 420-0771
                       Fax: (212) 420-6007
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-<br>Direct**</u> | <u>**Re-<br>Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit<br>Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir<br>Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                    3
 2            THE CLERK:  The Republic of Kazakhstan against
 3   Does 1 through 100.  Counsel, please state your name for
 4   the record.
 5            MR. JACQUES SEMMELMAN:   For the plaintiff
 6   Jacques Semmelman, Curtis Mallet-Prevost & Mosle, and with
 7   me is my partner Michael Moscato.
 8            MR. JAMES ROSENFELD:   Good morning, Your Honor.
 9   For defendants, for non-party Respublika, Jim Rosenfeld,
10   Davis Wright Tremaine.
11            THE COURT:  Okay.  All right, we are here I
12   guess as chapter 2 of the discovery conference that we
13   started on September 18 of this year.  There have been a
14   number of very recent developments in the case.  I take it
15   counsel are aware of Judge Ramos' decision of last evening.
16            MR. ROSENFELD:  Yes, Your Honor.
17            MR. SEMMELMAN:  Yes, Your Honor.
18            THE COURT:  And I also got a letter yesterday,
19   it was actually on the - it was filed yesterday, I just saw
20   it this morning - a letter from Mr. Semmelman dated October
21   27, 2015.  Have you seen that, Mr. Rosenfeld?
22            MR. ROSENFELD:  I have, Your Honor.
23            THE COURT:  Okay.  All right, well, let's start
24   I guess with the question of the deposition which I think
25   raises a number of thorny issues.  All right, and plaintiff
```

```
 1                                                    4
 2   is seeking – excuse me – Respublika is seeking essentially
 3   a protective order directing that either the deposition be
 4   adjourned or that it take place on written questions or
 5   maybe there's some other forms of relief Mr. Rosenfeld
 6   thinks are appropriate.  Why I don't hear from you first,
 7   Mr. Rosenfeld, then I'll hear from Mr. Semmelman.
 8             MR. ROSENFELD:   Sure, Your Honor.  Your Honor's
 9   correct --
10             THE COURT:   You can remain seated by the way.
11   Everybody can remain seated, it's okay.
12             MR. ROSENFELD:   Thanks.
13             THE COURT:   Go ahead.
14             MR. ROSENFELD:   You're right, Your Honor, we
15   resolved – we were last time to resolve the procedural
16   objections, and you directed us back here on the
17   substantive issues to see whether, first, we could resolve
18   on our own and if not whether we could come back to the
19   Court and try to resolve any of the issues before going off
20   to London for this deposition.  I think the order yesterday
21   on our motion to clarify is significant and affects the
22   issues here because it's based on the First Amendment.
23             The Court granted our motion for clarification,
24   holding that the injunction didn't apply to Respublika
25   because, as it's written, applying against Respublika would
```

1
2  be a prior restraint, and it relied on the key First

3  Amendment cases of <u>Smith v. Daily Mail</u> and <u>Bartnicki v.</u>

4  <u>Vopper</u>, which together essentially say that the First

5  Amendment grants persons a near absolute right to publish

6  truthful information about matters of public interest, and

7  <u>Bartnicki</u> says, even if you are legally provided with

8  materials that someone else illegally intercepted, you're

9  still entitled, the media is still entitled to publish

10  those materials.

11            And here we're seeking, you're correct, we're

12  seeking in the – we sort of proposed a few different

13  things.  One, our first choice, a stay, not a motion to

14  quash, but a motion to stay until other discovery's taken,

15  and the Court has granted them already, permission to go

16  ahead with certain other discovery, that establishes basis

17  for taking discovery from our media client

18            THE COURT:   Let me ask you one question which

19  neither side really addressed in a joint letter I got dated

20  October 26.  What law applies to Respublika's claim of the

21  reporter's privilege?

22            MR. ROSENFELD:   U.S. law, Second Circuit law --

23            THE COURT:   Why?

24            MR. ROSENFELD:   First Amendment argument --

25            THE COURT:   Why?

```
 1                                                         6

 2              MR. ROSENFELD:   Because there are --

 3              THE COURT:   My understanding is, I looked on the

 4  internet today, and my understanding is Respublika's

 5  website publishes in a foreign language.

 6              MR. ROSENFELD:   Respublika publishes in English

 7  as well.

 8              THE COURT:   I didn't see it on the internet.

 9              MR. ROSENFELD:   And they direct - and they have

10  a large U.S. audience --

11              THE COURT:   Where are their - do they have

12  offices?

13              MR. ROSENFELD:   They originally had offices

14  within Kazakhstan and they're now in exile in Europe, in

15  locations that they wish not to disclose in Europe.

16              THE COURT:   Well --

17              MR. ROSENFELD:   Publishing only on the internet.

18              THE COURT:   I mean let me ask you a question.  I

19  genuinely don't know what the answer is, and nobody has

20  addressed this in their papers.  If you have a reporter in

21  country X who gathers information in country X, publishes a

22  story in country X, publishes it in hard copy in country X,

23  and the publication's periodical also has an internet

24  version that they put up, and let's assume that the story,

25  the content of the story is primarily of interest to the
```

7

citizens of country X – it would have very little interest

to citizens or residents of other countries – is that

reporter in that hypothetical entitled to First Amendment –

is he entitled to the protection that's afforded to

reporter's sources or to reporters with respect to the

sources, is he entitled to the protection that reporters

get with respect to their sources that's afforded in the

United States?  Has the internet globalized the First

Amendment?

MR. ROSENFELD:   Right.  On that set of facts,

and I assume another part of the hypothetical is that the

lawsuit and claims are brought in the U.S. under U.S. law.

THE COURT:   I haven't talked about a lawsuit

yet.

MR. ROSENFELD:   Okay, so I'm not certain, and I

think that our facts are different than that.  I think

there are greater U.S. connections here because --

THE COURT:   Well, we agree though that the

question of applicable law is something that, the answer I

didn't think is self-evident, do we agree on that much?

MR. ROSENFELD:   I think the answer – I think the

answer is clear here because of the U.S. connections, and

that is that our servers are in the U.S., the injunction

was obtained in the U.S. and brought to those U.S. servers.

1

2  So we're publishing here on service providers based in the

3  United States and on Facebook which is based in the United

4  States.

5       THE COURT:   And then published, but you publish

6  elsewhere also, do you not?

7       MR. ROSENFELD:   We publish on the internet, so

8  that's --

9       THE COURT:   They publish worldwide.

10      MR. ROSENFELD:   Anyone who has access to the

11  internet can see the website, but the service providers are

12  in the U.S.  And a substantial part of Respublika's

13  audience is in the U.S. because there's an exiled community

14  here and also because there have been, there's been State

15  Department and congressional attention to the human rights

16  violations of the Kazakhstan regime.  So it is --

17      THE COURT:   I'm not sure that affects – what the

18  State Department does I'm not sure affects the choice of

19  law issue.  I mean usually with respect to questions of

20  privilege, I mean if you're talking about the attorney-

21  client privilege or the priest-penitent privilege or

22  similar privileges, ordinarily you look to the law of the

23  jurisdiction in which the relationship was formed.  I'm not

24  sure how this plays out with respect to reporter's claims

25  of privilege in connection with stories published on the

1                                                                        9

2   internet.  I genuinely don't know what the answer is.

3              MR. ROSENFELD:   I think the only connection here

4   was that the publications at issue were published abroad

5   and are available anywhere in the world.  Because they're

6   on the internet, I would have a much tougher case to make.

7   I think the U.S. connections here, of the publication on

8   the internet, and the direction of the content in part to a

9   U.S. audience establishes the necessary basis to apply the

10  First Amendment to these claims which are brought here in

11  this court.

12             THE COURT:   All right, I interrupted you.  You

13  started talking about the relief sought, and you said the

14  first thing was a stay of the deposition.  What's the

15  second alternative?

16             MR. ROSENFELD:   The second is, you know, we are

17  basing this on the – we're basing our reporter's privilege

18  arguments on Second Circuit law and the standard appears on

19  page 6 of the joint letter.  I mean the test is that --

20             THE COURT:   Among other things they've got to

21  exhaust other sources first?

22             MR. ROSENFELD:   They've got to exhaust other

23  sources first, and there has to be a clear and specific

24  showing that the information is highly material and

25  relevant and necessary or critical to the maintenance of

1  the claim.

2

3          So what we're basically arguing is based on –

4  we're arguing for a stay based on the inherent authority of

5  the court, based on Rule 26(c) and 45(d), and based on the

6  First Amendment overlay here, this obligation to go to

7  other services, to go to other sources first, that a stay

8  should apply across the board.  If that – sort of second to

9  your argument is, if not a stay, then in order to avoid the

10  burden of going to London and for all the other reasons I

11  just said, there should be, first, a written deposition

12  under Rule 31 or – it didn't say this in the letter but it

13  occurs to me now so I'll say it because it's effectively

14  the same thing – an affidavit from our client.  The client

15  would be willing to sign an affidavit saying it had nothing

16  to do with and has no knowledge of the alleged hacking.

17  And perhaps there are other things we could put in the

18  affidavit that would satisfy plaintiffs and stay the

19  discovery until they've taken other discovery.

20          And the sort of third tier that I proposed is,

21  and if Your Honor does not stay, grant a stay, is that we

22  think the subject matter in the deposition notice is too

23  broad and would argue for narrowing, which we can go

24  through.

25          THE COURT:   All right, and just one other

                                                          11

question.  My understanding is – I'm looking at the

30(b)(6) notice to Respublika.  My understanding is number

4 is withdrawn.

          MR. SEMMELMAN:    That's correct, Your Honor.

          THE COURT:    All right.  And my understanding

also is is that Mr. Ketebaev, Muratbek Ketebaev going to be

deposed pursuant to Judge Ramos' decision on Monday.

          MR. SEMMELMAN:    That's correct, he will be

deposed on a list of topics that Judge Ramos has approved,

and that is a Hague Convention proceeding, and as the Court

may be aware, that could take many, many months before any

deposition actually occurs.  But it's going to be formally

ordered by the Court; it was informally ordered by the

court at the conference on Monday.

          THE COURT:    Is there anything else you want to

tell me, Mr. Rosenfeld, before I hear from Mr. Semmelman?

          MR. ROSENFELD:    Well, Your Honor, I'm happy to

go through the topics and the eight, now seven topics, if

Your Honor would like, or if Your Honor would prefer, I'm

happy to have counsel go ahead, and then we can go back and

forth on the topics.

          THE COURT:    Yeah, let me hear I guess from Mr.

Semmelman first on whether or not the deposition should go

forward or whether there should be some, whether it should

1

2 be deferred or whether it should use written questions or

3 something else.  Mr. Semmelman - you can remain seated

4 also, by the way.  I presume it's gonna be you and not Mr.

5 Moscato, am I correct?

6        MR. SEMMELMAN:  Well, if I need help, I will

7 turn to Mr. Moscato.

8        THE COURT:  All right.

9        MR. SEMMELMAN:  Thank you, Your Honor.

10        THE COURT:  Fair enough.

11        MR. SEMMELMAN:  Thank you.  Let me start by

12 saying that with respect to the order that was issued by

13 Judge Ramos yesterday afternoon, while Mr. Rosenfeld has

14 correctly described the substance of the order, I would

15 like to point out that the Court specifically said the

16 foregoing is without prejudice to plaintiff to reapply for

17 the imposition of an injunction against the use of the

18 stolen materials by Respublika should it obtain sufficient

19 evidence to support such an order.

20        So we're talking now about a proceeding to try to

21 obtain such evidence --

22        THE COURT:  How do you get that?  Isn't that

23 pre-complaint discovery which is ordinarily precluded?

24        MR. SEMMELMAN:  Well, Respublika has appeared in

25 this case in some capacity --

13

1

2          THE COURT:   Right.  No, but I mean we've got a

3   complaint.  Rule 26 tells us that discovery has to be

4   relevant to a claim or defense and non-privileged.  And

5   there's a wealth of authority, including Iqbal and a number

6   of other cases, that say before you can get discovery

7   against a party, you've got to state a claim against that

8   party.  You have not stated a claim against Respublika,

9   agreed?

10          MR. SEMMELMAN:   We have not asserted a claim

11   against Res --

12          THE COURT:   You haven't stated a claim against

13   them.  So I think if you get discovery from them as a non-

14   party, you get discovery with respect to the claims that

15   are currently asserted, but I don't know how, I don't know

16   what justifies discovery to see if you have a claim against

17   them.

18          MR. SEMMELMAN:   Well, this is certainly a unique

19   situation because, as the Court knows very well, they came

20   into the case, they asserted themselves in the case, they

21   sought relief from the court, from the district court.  We

22   cross-moved for discovery.  The district court delegated

23   the discovery aspect of this to Your Honor, and the

24   district court in yesterday's opinion specifically put in

25   footnote 2 on page 3 that we cross-move for expedited

1

2  discovery.  The cross-motion has been referred to

3  Magistrate Judge Henry Pitman for resolution.  And then the

4  court goes on to say that if we get evidence, we can come

5  back.

6  So the district court seems to have certainly

7  left open our ability to continue to pursue the ongoing

8  efforts to take discovery.  The district court was

9  certainly aware of the proceedings that were going on

10  before Your Honor at least in some fashion.  The district

11  court knew that Your Honor at the last session in September

12  had ruled that we can go ahead and take a deposition. The

13  district court chose not to interfere with that or in any

14  way reverse that or vacate that.  District court could've

15  said, well, the forecloses any discovery.

16  THE COURT:  My question I guess is more as to

17  scope than whether you get discovery.  I don't think

18  there's suggest dispute that you could depose Respublika

19  here or take discovery of Respublika as a non-party with

20  respect to the claims you've asserted.  But how do you get

21  - how do you get discovery to find out whether you have a

22  claim against them if you haven't stated a claim against

23  them?

24  MR. SEMMELMAN:  It's --

25  THE COURT:  I mean that seems to be what, you

15

know, Judge Lynch discussed it when he was a district judge

in a case called Podany against Stephens, 350 F. Supp. 2d

375, and it's also discussed in a decision I issued in 2010

called Bridgewater against Taylor, 745 F. Supp. 2d 355.

One of the --

        MR. SEMMELMAN:   Well, I know --

        THE COURT:   Go ahead.

        MR. SEMMELMAN:   May I respond?   Thank you.

We're not seeking to take discovery to find out if we have

a claim against them.   We are seeking to take discovery to

see if they are bound by the injunction.   And Judge Ramos

in yesterday's opinion on page 3 said that we have to prove

that, quote, "Respublika itself violated the CFAA or was

complicit in the alleged hacking."   That's the standard

we're gonna have to meet, and the discovery we propose to

take will relate to that issue.

        Secondarily, the discovery --

        THE COURT:   I'm not sure you're entitled to that

though.   If you don't have a claim against - I'm really

hard-pressed to understand how you can take discovery of

Respublika to see if you have a claim against them when you

haven't stated a claim against them.

        MR. SEMMELMAN:   But we're seeking to take

discovery from Respublika not to ascertain whether we have

```
 1                                                    16
 2   a claim against them in the sense of a cause of action to
 3   be included in the complaint but to see if they are bound
 4   by the injunction.  They are --
 5            THE COURT:  If they're bound by the injunction,
 6   do you have a claim against them?  I'm really a little
 7   confused here.  If they're bound by the injunction, you
 8   wouldn't sue them?  You wouldn't assert a claim against
 9   them?
10            MR. SEMMELMAN:  I'm not saying we would or we
11   wouldn't.  I'm saying right now, right now the issue that
12   we are pursuing is to get discovery to see if they are
13   bound by the injunction, and that was what motivated us in
14   our framing of the eight topics in our Rule 30(b)(6)
15   notice.  I'm not predicting what the discovery will show.
16   I'm not predicting what we will do once we get the
17   discovery.  I'm not at that point.  I'm at the point where
18   pursuant to what has occurred so far in the district court
19   and in Your Honor's court, we're seeking to follow up on
20   our cross-motion, which Your Honor I believe granted last
21   time we were here, to take a deposition of Respublika with
22   regard to the issue of whether or not they are bound by the
23   injunction.
24            THE COURT:  Yeah, I know but the geography has
25   changed given Judge Ramos' decision last evening.
```

```
 1                                              17

 2            MR. ROSENFELD:   May I respond to the question?

 3            THE COURT:   Well, let me finish with Mr.

 4   Semmelman.

 5            MR. ROSENFELD:   Sure.

 6            THE COURT:   Mr. Semmelman, let me shift gears a

 7   little bit.  Why would it not make sense to proceed by way

 8   of written questions in the first instance?  I mean it's

 9   clear to me that there are going to be a lot of assertions

10   of privilege here which I'm really loathe to address

11   without briefing on the choice of law issue and without

12   knowing what the specific questions are and what the

13   factual record is.

14            I have a strong sense that if you go over to

15   London and take the deposition, it may well be a very short

16   deposition, and I think there's going to wind up

17   necessarily being motion practice afterwards.  Why would it

18   not make sense to proceed by way of written questions in

19   the first instance without prejudice to your right to

20   subsequently seek a testimonial deposition?

21            MR. SEMMELMAN:   Because it's just not practical

22   to try and formulate a list of written questions that will

23   capture the various possible permutations that could arise

24   given what the answers may or may not be.  It's a very

25   impractical way --
```

1                                                            18

2            THE COURT:   That's always the case.  It's not a

3   perfect substitute for an oral deposition, but the

4   inability to ask follow-up questions is inherent in a

5   written, in a deposition on written questions.  But that

6   doesn't mean it's never an appropriate alternative.

7            MR. SEMMELMAN:   But it has been an appropriate

8   alternative in fairly unusual circumstances, for example,

9   where somebody wants to depose a CEO and the CEO submits an

10  affidavit saying I really don't have anything to add.

11  Other people have been deposed that have answered

12  questions.  And we cited a case that Your Honor decided in

13  which Your Honor said, okay, we'll depose the CEO through

14  written questions.  This is a different category.  This is

15  a 30(b)(6).  They don't have to designate their CEO.  They

16  don't have to --

17            THE COURT:   I understand that, but we know, I

18  think we know that there are going to be a lot of

19  assertions of privilege.

20            MR. SEMMELMAN:   I would anticipate that, of

21  course.  They've said they're gonna do that.  In fact, they

22  predicted, and it's kind of interesting that they predicted

23  this on page 8 of the joint letter that the answers to any

24  of our questions will either be we don't know anything, we

25  only know what everyone else knows, or privilege.  Now, how

19

1

2  they know ahead of time what the answers will be is beyond

3  me, but they've said that.  And I'm puzzled that they

4  should be entitled to just predict that whatever the

5  question is those three answers will always be the answer.

6       Normally, you sit down, you take the deposition,

7  you ask questions, there are objections, and a record is

8  made.  There're detailed questions, not just broad

9  questions, detailed specific questions, there's back and

10  forth, there's colloquy.  There are directions not to

11  answer.  There are direction to answer with a reservation

12  of rights.  It's a dynamic process, and we might sit there

13  for a few hours, but there will be a developed record that

14  we can then bring back.  With a written deposition, I

15  anticipate is going to be close to meaningless because how

16  many questions can we formulate, ten, twenty, thirty?

17  We're not gonna formulate several hours' worth of questions

18  as we would at a deposition.

19       We ask d them where they wanted the deposition;

20  they said London; we said fine.  If they want it somewhere

21  else, we can change the venue.  We're not holding them to

22  any particular venue.  But we submit, Your Honor, that it

23  should be a sit-down deposition in a location convenient

24  for them.  We'll pick a date that works for everybody else.

25  There's nothing out of the ordinary in having to do that.

```
 1                                                    20

 2            One more comment, Your Honor.  In terms of the

 3   privilege issue, they've put the horse before the cart.

 4   They're asserting privilege, they say, well, we're gonna

 5   have to show that we've exhausted other avenues, that we

 6   meet the burden for piercing privilege.  We're not yet at

 7   the point where we're trying to pierce privilege.  We will

 8   perhaps get to that point, but --

 9            THE COURT:   Look, I mean some deposition in some

10   situations you know that there's going to be a substantial

11   privilege dispute.  I mean, for example, if someone is

12   trying to depose adverse counsel or even in-house counsel

13   for a corporation in a case where a corporation is a

14   defendant, you know ahead of time there are going to be a

15   lot of privilege issues.  So to suggest that they're

16   putting the cart before the horse I think sort of ignores

17   something that I think is fairly obvious here.  But go

18   ahead.

19            MR. SEMMELMAN:   That's one observation.  Second

20   observation, they haven't asserted journalistic privilege

21   with regard to each of our topics.  They have with regard

22   to several, but not with regard to all of them.  They've

23   asserted other privileges, they've asserted attorney-client

24   privilege which does not foreclose questions that surround

25   the issues such as who was the attorney, when was the
```

21

attorney retained.  Follow-up questions relating to that.

While they've asserted journalistic privilege with regard

to a number of topics, it's not universal.

And from our point of view there is enough to

make it worth our while to go to London, sit down for

several hours, take the deposition, make a detailed record.

We're the ones going to London.  They suggested London.

We're the ones going there.  Whatever burden is associated

with London falls on our shoulders.  We're gonna be there,

we're gonna take the deposition, and we'll see what the

record show.

I would respectfully suggest, Your Honor, that to

foreclose the deposition on the ground that, as Respublika

is suggesting, really isn't necessary and isn't warranted.

There's nothing so extraordinary about this deposition that

extraordinary measures need to be taken.  It's much more

routine than they're making it sound.  We should take the

deposition and come back, which we probably will have to

do, but we'll come back but with a fully developed record

instead of the kind of spotty, incomplete record that would

be adduced using a written deposition.  It's just like an

interrogatory to a party, I think we all know that with

rare exception interrogatories to parties tend not to be

particularly fruitful.

1

2          THE COURT:   Let me ask you one other question

3   about two of the particular topics here.  Do you have the

4   30(b)(6) notice handy?

5          MR. SEMMELMAN:   I do.

6          THE COURT:   Okay.  Topics – no, I've got it.

7   I've got it in front of me.  Do you have it also, Mr.

8   Rosenfeld?

9          MR. ROSENFELD:   I do, Your Honor.

10          THE COURT:   Numbers 5 and 6, how do they relate

11   to the complaint?

12          MR. SEMMELMAN:   These relate to the preliminary

13   injunction.

14          THE COURT:   Okay, but how do they relate to the

15   complaint?

16          MR. SEMMELMAN:   Well, they would relate to the

17   complaint only to the extent that they show a consciousness

18   of guilt and a recognition that they were bound by the

19   injunction and that they were trying to conceal their

20   violation of the injunction.

21          THE COURT:   No, I mean there you bump up against

22   the cases that say you don't get discovery to find out if

23   you have a claim until you state a claim.

24          MR. SEMMELMAN:   But that's why I --

25          THE COURT:   I don't see how you get around that

1  principle.

2        MR. SEMMELMAN:   Because, as I noted earlier,

3  we're not trying to take this discovery to see if we have a

4  cause of action against Respublika.  We're trying to take

5  this discovery to see if they are bound by the injunction.

6  That's the only reason we're here, that's the only reason

7  we submitted this 30(b)(6) notice to see if they're bound

8  by the injunction.

9        And interestingly, when Judge Ramos a couple of

10 days ago parsed through the topics from Mr. Ketebaev, he

11 left standing a topic that bears on this, and let me first

12 say that in our Ketebaev motion, and that was The Hague

13 Convention motion, we filed that motion before we became

14 aware of this backdating and reposting.  We filed a motion

15 in May; we became aware of the backdating in June.  And so

16 our motion to take Mr. Ketebaev's deposition did not

17 include any reference to backdating the post.  However, in

18 topic 17 of that revised list of topics which Judge Ramos

19 as approved, topic 17 says, "The identity of the persons

20 who took down two Facebook posts" --

21       THE COURT:   I'm sorry, which --

22       MR. SEMMELMAN:   Okay, I'm going too quickly,

23 Your Honor.

24       THE COURT:   I'm looking at - maybe I'm looking

1                                                              24

2   at the wrong document.  I'm looking at exhibit B to your

3   letter of yesterday.  Is that the wrong --

4           MR. SEMMELMAN:   It's an exhibit.  I will - yes,

5   it's exhibit B.  It is exhibit B to yesterday's letter.

6           THE COURT:   My --

7           MR. SEMMELMAN:   Oh, I'm sorry --

8           THE COURT:   My topic 17 says, "Mr. Ketebaev's" -

9   -

10          MR. SEMMELMAN:   You have the - my apologies -

11  you have the earlier version that was not revised.  Topic

12  26 on page 7.

13          THE COURT:   Topic 26 on page 7.  All right, the

14  identity of --

15          MR. SEMMELMAN:   That has been approved by Judge

16  Ramos for the deposition of Mr. Ketebaev.  And that one

17  says, "The identity of the persons who took down two

18  Facebook posts containing stolen materials from the

19  Respublika Facebook page around March 17/18, 2015."

20          Now, Judge Ramos apparently is prepared to allow

21  questioning on information relating to the takedown of

22  posts containing stolen material.  And for the reasons I've

23  indicated, we did not bring before him the broader takedown

24  and backdating that we learned about later, but there's

25  nothing that has occurred before Judge Ramos that suggests

25

that Judge Ramos would preclude a questioning on those

topics.  It relates to the use of the stolen materials, the

takedown of the stolen materials, the reposting of the

stolen materials.  It's all about stolen materials.  So it

has a relevance to the case at large as well as to the

injunction.

         If it would help, Your Honor, I can hand up a

redline of the --

         THE COURT:   I'm looking at a sentence from – I'm

still very troubled by this.  I'm looking at a sentence

from a decision that Judge Lynch issued in 2004.  This is

the Podany case which I referenced earlier.  Judge Lynch

wrote, "Except in certain circumstances, such as to

perpetuate vital testimony, discovery is authorized solely

for parties to develop the facts in a lawsuit in which a

plaintiff has stated a legally cognizable claim, not in

order to permit a plaintiff to find out whether he has such

a claim and still less to salvage a lawsuit that has

already been dismissed for failure to state a claim."

         I mean what you want to do here, to the extent at

least 5, in topics 5 and 6, I don't how you can – I'm not

sure how you do that without violating the principle that

you've got to state a claim before you get discovery to

establish a claim.

1

2          MR. SEMMELMAN:   Your Honor, I don't know that

3   I've read the case Your Honor was reading from.  I don't

4   recall it was cited by either party here, so I'm not

5   familiar with it.  But I don't – I'm not aware that that

6   was a case having to do with whether somebody is bound by

7   an injunction because they're in active concert or

8   participation with a wrongdoer.  I don't know the answer to

9   that, Your Honor; I'm just observe that it might be a very

10  different circumstance.

11          THE COURT:   All right.  Anything else you want

12  to tell me, Mr. Semmelman?

13          MR. SEMMELMAN:   No, I --

14          THE COURT:   What're your thoughts on what law

15  applies here with respect to the reporter's privilege?

16          MR. SEMMELMAN:   Well, that's an interesting

17  question that Your Honor raised.  The parties have been

18  proceeding as if Second Circuit law applies without

19  apparently disputing that.  But now that Your Honor has

20  raised the issue, I think it's worth further research and

21  analysis.  We were proceeding on the basis --

22          THE COURT:   I think everyone would have just

23  assumed this is a matter of domestic U.S. law but hadn't

24  really thought about it.

25          MR. SEMMELMAN:   We had reached the conclusion

without seriously researching it because we're here in

court based fundamentally on violation of a U.S. statute,

there's a U.S. preliminary injunction, and it was our

assumption, for lack of a better word, that there's no

reason to disagree with Respublika that Second Circuit law

controls here.  But now that Your Honor has raised the

issue, all I can say is we will go back and take a closer

look at it.

THE COURT:  You want to respond, Mr. Rosenfeld?

MR. ROSENFELD:  You asked earlier how does

Kazakhstan establish the basis of a claim against

Respublika without discovery, and I agree that the, they're

not entitled to take discovery, and Your Honor cited a

couple of cases, Podany and Bridgewater --

THE COURT:  Well, they're entitled to take

discovery of you as a non-party.

MR. ROSENFELD:  Right.  But they're not allowed

to take discovery of us as a party in order to establish

the claim.  And the answer of how they can establish --

THE COURT:  Well, they're entitled to take

discovery of you as a non-party with respect to the claims

asserted in the complaint.

MR. ROSENFELD:  Correct.

THE COURT:  I don't think there's any dispute on

1   that.

2           MR. ROSENFELD:   Correct.

3           THE COURT:   Okay, go ahead.

4           MR. ROSENFELD:   So how can they establish a

5   claim against us?  They can take the discovery they've

6   already been permitted to take.  They can take other

7   discovery if there are other depositions to take.  We

8   haven't asserted any objection to the - we don't have a

9   stake one way or the other in the discovery they've sought

10  to take via The Hague.  And they can do it that way, and

11  they're obligated to do it that way in order to establish a

12  basis for seeking the discovery against us under the law

13  that we've cited.

14          As Mr. Semmelman noted, the Court, you know --

15          THE COURT:   What about Mr. Semmelman's point,

16  which I think has some traction, that a deposition on

17  written questions is really a poor substitute for a viva

18  voce deposition.  I mean you can't ask follow-up questions.

19  I think we all know the answers to depositions on written

20  questions are usually crafted by lawyers not by the

21  witness.  And usually the answers are not terribly

22  illuminating.  I mean what about his point that written

23  deposition deposition on written questions is just not a

24  good substitute for an oral deposition?

```
 1                                                        29
 2              MR. ROSENFELD:    A Rule 31 deposition isn't the
 3    same thing as a Rule 30 deposition I agree.
 4              THE COURT:    Yeah.
 5              MR. ROSENFELD:    The reason it's- and to be
 6    clear, we've suggested that the Rule 31, the written
 7    deposition take place here without prejudice if they can
 8    establish a basis to go forward and take a deposition
 9    later.  We don't think they have this basis now.  So it's a
10    gate that they have to get by, it's a way to get some
11    information.
12              THE COURT:    Yeah, ordinarily you don't need to
13    show good cause before you take a deposition.  I mean --
14              MR. ROSENFELD:    No, we --
15              THE COURT:    So in the ordinary - I mean
16    certainly in the vast majority of cases oral depositions
17    take place without any kind of required showing ahead of
18    time.
19              MR. ROSENFELD:    Correct.  Correct, and the
20    difference here, Mr. Semmelman said this case is routine.
21    I would respectfully disagree with that.  I think it's
22    anything but routine.  I think we have a foreign government
23    seeking to take the deposition of the lead media critic of
24    that government.  There's a history detailed by human
25    rights groups and congressional hearings of oppression, not
```

1
2  just of the press but of this particular entity.  So

3  there's a real reason to fear harassment, persecution, etc.

4  In addition – you know, which is exactly what Rule 26

5  allows courts to intervene to avoid, and Rule 45 as well.

6         THE COURT:  Well, I think the harassment that

7  Rule 26 contemplates is usually harassment at the

8  deposition, somebody asking argumentative questions or

9  asking redundant questions or asking irrelevant and

10  embarrassing questions.

11         MR. ROSENFELD:  Let me focus on oppression

12  rather than harassment then.  I think maybe oppression is

13  the better basis, and I think this is the classic example

14  of a case in which there's reason to think that a

15  deposition could be used in that way.  In addition, we have

16  the First Amendment issues we've raised, and we have the

17  obligation under Second Circuit law to seek discovery first

18  from other sources.  And, in addition, we have the

19  practical reason, and this goes to undue burden, that, as

20  Your Honor pointed out, we're going to go to London, we're

21  gonna to get into the exact privilege issues that are

22  apparent from this letter.  The parties have already staked

23  out their positions, and there's lots of disagreement.  And

24  it's gonna be unduly burdensome and a waste of resources to

25  go and take that deposition and come back.

31

2          So we think there's a compromise here which is to

3   do a written deposition first, take other discovery first,

4   and see where that leads.  And if there's a basis to take

5   the deposition later, they have not – this doesn't

6   prejudice their ability to do that.

7          I would also say one other point, we haven't

8   taken the position, counsel referred to our statement on

9   page 8 about, you know, the answers will either be "we

10  don't know anything," "we know only what everyone knows,"

11  or "privileged."  That specifically was said with respect

12  to matters 1 through 4.  It's not that there's nothing we

13  would have to say in response to any questions.  This

14  deposition, which was permitted by the court on narrow

15  grounds and is limited to the matters here, is very

16  constrained to these topics.

17          And as to matters 1 through 4, which are about

18  the hackers, the hackings – well, 4 is out of the question

19  now – and the circumstances under which Respublika came

20  into possession of the stolen materials, you know, our

21  position is those are going to be fruitless because we

22  don't know anything about any alleged hacking, we don't

23  even know if there was a hacking or whether there was a

24  leak.  We certainly don't know, if there was a hacking, who

25  committed it.  We're willing to say that in affidavit, we

```
 1                                          32
 2   will say that in response to Rule 31 questions.  And,
 3   therefore, if we go to London, the --
 4           THE COURT:    Number 3 I presume you'd assert
 5   privilege?
 6           MR. ROSENFELD:    Number 3 gets into reporter's
 7   privilege issues.  You know, and it would be - number 3
 8   would be okay.  Again, we think the deposition should be
 9   stayed for all the reasons we've said.  But if the
10   deposition went forward - I want to point the Court to
11   Kazakhstan's portion of the joint letter on page 15.
12   Actually it's in their paragraph on topics 1 and 2, but I
13   think it applies to topic there also.
14           They say in the second sentence there, "These
15   areas of examination go to the very heart of the central
16   issue, whether Respublika was involved, that is, whether it
17   solicited, encouraged, planned, financed, aided, abetted,
18   or otherwise assisted the hackers and hackings."  They did
19   not solicit, encourage, plan, finance, aid, abet, or
20   otherwise assist the hackers and the hackings, if there was
21   a hacking.  If it went forward at all, it should be
22   narrowed to that.  Our contention is if it went forward, it
23   should go forward in writing so we can say that in writing.
24           But what it shouldn't go to is stuff that is
25   beyond the bounds of that.  The previous sentence talks
```

1                                                          33

2   about Respublika's knowledge of and relationship to the

3   hackers and hackings.  There are other ways in which the

4   requests could be interpreted which go to relationships

5   with other sources or how we obtained these materials

6   lawfully, and we don't think, you know, we think that's

7   where you get into reporter's privilege issues.  So the

8   heart of it, whether we were involved with the hacking,

9   we'll testify that we don't, but I don't think we need to

10  go to London to do that.

11          THE COURT:   What about 5 and 6, do you believe 5

12  and 6 are appropriate?

13          MR. ROSENFELD:   I agree with the Court that,

14  with the Court's suggestion that Kazakhstan wouldn't be

15  entitled to discovery to establish claims.  This 5 and 6 is

16  too attenuated.  It clearly gets into privilege issues as

17  well.  But as counsel said, has said in the correspondence

18  and said again in the hearing today, what they're really

19  seeking here is to show consciousness of guilt, and that's

20  simply not a valid basis to go over there and show that

21  Respublika feels guilty, and you can see that from its

22  removing its posts.

23          So, no, I don't think these are legitimate.  I

24  think they're infused with privilege issues, and they're

25  just too attenuated to be appropriate matters for

1                                                            34

2    examination on these circumstances.

3              THE COURT:   All right.  Anything else?  I'm

4    going to hear from Mr. Semmelman again.  Is there anything

5    else you want to tell me?

6              MR. ROSENFELD:   Not at this time, Your Honor.

7              THE COURT:   Mr. Semmelman.

8              MR. SEMMELMAN:   I'll try to keep it short.  What

9    we just heard from Mr. Rosenfeld is a plea for an elaborate

10   advisory ruling before the deposition takes place.  And I

11   understand that we're here to shape the contours in some

12   sense --

13             THE COURT:   Well, the issue of an advisory

14   opinion goes so far.  I mean it's not uncommon for judges

15   to rule on what topics in a 30(b)(6) are in and what are

16   out.  I mean it sounds like Judge Ramos did something very

17   analogous to that with respect to the requests for Hague

18   Convention discovery.  So having said that, go ahead.

19             MR. SEMMELMAN:   And we certainly are not

20   challenging the, even the wisdom or the appropriateness of

21   going through our now seven topics and identifying which

22   ones should be on the table and which ones perhaps should

23   be off the table.  But what Mr. Rosenfeld is arguing for is

24   really no deposition, at least for now, either because we

25   should have a written process to start and then we'll see

1                                                                35

2  where we are or we should wait I don't know how many months

3  until we take Mr. Ketebaev's deposition in Poland.

4          I submit we should keep this fairly simple.  We

5  should keep it fairly simple.  We should take the

6  deposition in the venue they've designated as their venue

7  of choice.  We will go there.  Whatever burden is

8  associated with that will rest on our shoulders.  We are

9  prepared to undertake that.  We'll go, we'll take the

10 deposition in their venue, and then we'll have a record,

11 we'll have a detailed record with a lot of Q&A, a lot of

12 objections not doubt, but there will be a thoroughly

13 developed record rather than trying to anticipate what the

14 questions might be, what privileges might be asserted in

15 response to which questions.

16         All I ask, Your Honor, is let us take a

17 deposition, and then we will come back with a record.

18         THE COURT:  All right.  All right, and, Mr.

19 Semmelman, I presume you understand the deposition

20 transcript may wind up being very thin.

21         MR. SEMMELMAN:  That's a chance I'm prepared to

22 take.

23         THE COURT:  And you're assuming that risk, and

24 you're not gonna come back here and make an application for

25 costs because they objected in bad faith or something like

36

1   that?

2           MR. SEMMELMAN:   I --

3           THE COURT:   You know that there are going to be

4   a lot of objections coming.

5           MR. SEMMELMAN:   I'm aware or I've been warned

6   that objections will be coming, and I'm prepared to take on

7   that risk.

8           THE COURT:   Okay.

9           MR. ROSENFELD:   And it's our position --

10          THE COURT:   Do you want to address – one second,

11  let me just come back to Mr. Semmelman for a minute.  You

12  want to address 5 and 6 again?  I'm still hard-pressed to

13  understand – I mean in the absence of – in the absence of

14  authority demonstrating that someone in whose favor an

15  injunction has been issued is entitled to take discovery to

16  see if someone is subject to that injunction.  In the

17  absence of such authority, I'm still hard-pressed to see

18  how you get topics 5 and 6.

19          MR. SEMMELMAN:   Let me start by responding to

20  the authority point.  And the closest authority we have is

21  the Second Circuit Louis Vuitton case which we've cited in

22  various papers, not in the joint letter that came in but in

23  earlier filings with the Court including our cross-motion –

24  –

36

1   that?

2           MR. SEMMELMAN:   I --

3           THE COURT:   You know that there are going to be

4   a lot of objections coming.

5           MR. SEMMELMAN:   I'm aware or I've been warned

6   that objections will be coming, and I'm prepared to take on

7   that risk.

8           THE COURT:   Okay.

9           MR. ROSENFELD:   And it's our position --

10          THE COURT:   Do you want to address – one second,

11  let me just come back to Mr. Semmelman for a minute.  You

12  want to address 5 and 6 again?  I'm still hard-pressed to

13  understand – I mean in the absence of – in the absence of

14  authority demonstrating that someone in whose favor an

15  injunction has been issued is entitled to take discovery to

16  see if someone is subject to that injunction.  In the

17  absence of such authority, I'm still hard-pressed to see

18  how you get topics 5 and 6.

19          MR. SEMMELMAN:   Let me start by responding to

20  the authority point.  And the closest authority we have is

21  the Second Circuit Louis Vuitton case which we've cited in

22  various papers, not in the joint letter that came in but in

23  earlier filings with the Court including our cross-motion –

24  –

1                                                      37

2              THE COURT:   (inaudible) what that case says.

3              MR. SEMMELMAN:   I'm sorry?

4              THE COURT:   Tell me what that case says.

5              MR. SEMMELMAN:   Okay, that was a case involving

6    counterfeit handbags, and the district court in the

7    Southern District had issued an injunction --

8              THE COURT:   Was it against named defendants?

9              MR. SEMMELMAN:   There were named defendants,

10   yes.

11             THE COURT:   Okay, go ahead.

12             MR. SEMMELMAN:   Had issued an injunction against

13   the sale of counterfeit handbags, and then an employee of

14   the plaintiff went into another store and saw the

15   counterfeit handbags being sold in another store, and a

16   check of the records in the county clerk's office saw that

17   there was overlap in the ownership of this second store

18   with the ownership of the enjoined entity.  It was not

19   identical, but there were overlapping owners.  And the

20   plaintiff sought to enforce the injunction against this

21   second store.

22             The district court did not hold an evidentiary

23   hearing but denied the injunction, the extension of the

24   injunction on various grounds.  The Second Circuit reversed

25   and said an evidentiary hearing should've been held to

38

1  determine the facts.

2        Now, that's not a discovery case, but it is a

3  case involving taking of evidence and in order to ascertain

4  whether somebody who was not originally named in the

5  injunction is nevertheless bound by it to determine if the

6  person is in active concert or participation with the named

7  parties.

8        So that really is part of the basis on which we

9  argued in our cross-motion.  We asked the judge for an

10  evidentiary hearing, which at least as of now we haven't

11  had, although I assume, if we come back with some evidence

12  and request one, presumably we would get one, but we're not

13  there yet.  But in aid of the evidentiary hearing we said

14  we would ask for expedited discovery because there is case

15  law, not necessarily in this precise context, but,

16  generally speaking, there's case law that when you have a

17  preliminary injunction hearing, courts will often grant

18  expedited discovery in aid of that hearing.

19        So we ask for the taking of evidence so that we

20  could establish that Respublika is in active concert or

21  participation with the hackers.

22        THE COURT:  Well, no, but that – you still then

23  bump up against the principle that you don't get discovery

24  to see if you have a claim until you've stated a claim.

                                                                  39

 1

 2          MR. SEMMELMAN:   But --

 3          THE COURT:   You haven't stated a claim against

 4  Respublika yet.

 5          MR. SEMMELMAN:   But I come back to we're taking

 6  it to see if they're in active concert or participation --

 7          THE COURT:   Yeah, but that seems to be a

 8  distinction without a difference to me.  I mean if you find

 9  out they are in active participation, you're going to

10  assert a claim against them as sure as God made green

11  apples.

12          MR. SEMMELMAN:   Well, it may well be if we get

13  the evidence, well, we'll see what we do with it, but right

14  now our objective is more basic.  Our objective is more

15  basic.  It's to develop evidence to see if they're in

16  active concert or participation with the hackers and,

17  therefore, bound by the preliminary injunction as in the

18  Louis Vuitton case that I described.  That's our

19  motivation.  I don't know what the evidence is going to

20  show.  I don't know whether it'll point us in the direction

21  of saying they are now to be rendered a party or they are

22  merely in active concert or participation with the hackers.

23  I just don't know.

24          But I think that we're trying to forecast things

25  that may materialize, things that may not materialize, and

1

2 I come back to what I was saying before, if we take the

3 deposition, ask the questions, we'll see where we are.

4 We'll see where we are.  We'll have the record.

5          THE COURT:  All right.

6          MR. ROSENFELD:  May I respond to that, Your

7 Honor?

8          THE COURT:  Go ahead.

9          MR. ROSENFELD:  The Louis Vuitton case doesn't

10 control here for three reasons.  First of all, as Your

11 Honor points out, the distinction between named defendants

12 and non-parties, Respublika's a non-party, there's no claim

13 against it.  Second of all, there was not a media defendant

14 in that case, and so you don't have the First Amendment

15 concerns that the Court's already acknowledged here on one

16 side of the scale.

17          And, third of all, the details that go to

18 oppression and undue burden are also case specific, and

19 they're much more pronounced here than they are in that

20 case given the history of oppression here that we've

21 detailed in our papers.

22          THE COURT:  Well, you know, on that score

23 there's really no affidavit setting forth an evidentiary

24 basis to conclude that there's oppression.

25          MR. ROSENFELD:  There is a submission that we've

```
 1                                                 41

 2   made to the courts, a lawyer affidavit submitting materials

 3   that we asserted in our underlying brief to Judge Ramos,

 4   the Court can take judicial notice of, and we cited --

 5             THE COURT:   What does that affidavit say?  Do

 6   you happen to have a copy of it with it?

 7             MR. ROSENFELD:   No, I don't have it with me,

 8   Your Honor.

 9             THE COURT:   Okay, tell me what it says.

10             MR. ROSENFELD:   So it was the - it was my

11   affidavit in support of our motion to clarify, attaching

12   all of - it just attaches all of the human rights reports

13   and congressional testimony and things of that nature about

14   the history of oppression by Kazakhstan of the media and of

15   Respublika in particular.  And we asserted in the first --

16             THE COURT:   There's a lot of hearsay.  There's

17   no affidavit from somebody who was --

18             MR. ROSENFELD:   There is none.

19             THE COURT:   -- the actual victim of oppression

20   or --

21             MR. ROSENFELD:   That's correct.

22             THE COURT:   -- no affidavit from somebody at

23   Respublika who's said people are calling him and hanging up

24   or engaging in other sort of questionable conduct.

25             MR. ROSENFELD:   That's correct, and our
```

1

2  assertion was, and I think it was in the first footnote of

3  our brief on the motion to clarify that the Court can take

4  judicial notice under Rule 201 of those materials, and we

5  cited a couple of cases in which the court has taken --

6          THE COURT:   I don't think newspaper articles are

7  judicially noticeable, except for the fact that --

8          MR. ROSENFELD:   These are not newspaper

9  articles.

10          THE COURT:   -- except for the fact that they

11  were published.

12          MR. ROSENFELD:   They're not newspaper articles,

13  and we're talking - I wish I had it here, Your Honor, but I

14  submitted it, we included it as exhibit, as the second

15  exhibit the joint letter.  I'm sorry, we included our brief

16  not the --

17          THE COURT:   Even congressional testimony, I mean

18  testimony before Congress is just one person's statement.

19  It's not information of unquestionable accuracy like the

20  periodic table.

21          MR. ROSENFELD:   Right.

22          THE COURT:   So I don't know how testimony before

23  Congress is judicially noticeable except for the fact that

24  it was given.  But the content is hearsay.

25          MR. ROSENFELD:   Even if we have a hearsay

43

problem on that, Your Honor, we have the first two of the

three reasons which I already said.  Your Honor pointed out

the distinction the defendants and non-defendants, and the

First Amendment issues which are here but which were not in

the Louis Vuitton case.  I mean simply put, going to London

and taking this deposition to see what happens, knowing, as

Your Honor's pointed out, that we're gonna come back, we're

gonna have a lot of disagreements.  We've already put them

down on paper, and we're gonna come back with a very thin

transcript is extraordinarily burdensome and wasteful and

it's inappropriate based on the First Amendment arguments

we've made.  So we would object for all the reasons we've

set forth to be going there and seeing what they can find

in this situation.

         THE COURT:   All right.  No one is asserting

financial hardship here, is that right?

         MR. ROSENFELD:   We haven't made that objection.

         THE COURT:   Okay.  Can you give me any examples

of acts of oppression that have been perpetrated against

Respublika or its staff?

         MR. ROSENFELD:   Yes.  When Respublika existed as

a newspaper within Kazakhstan, there were threats made

against them.  The --

         THE COURT:   Threats of what?

1

2          MR. ROSENFELD:   Threats made against them of

3   (indiscernible) articles critical of the government.   They

4   put - specifically they - a decapitated dog's body was put

5   on their front gate with a note that said, "There will be

6   no next time."   And then I think the next --

7          THE COURT:   Is there - all right, and the

8   assumption is that it was done by someone at the

9   government?

10         MR. ROSENFELD:   Yes, that is our assumption.

11  The next day --

12         THE COURT:   The dog's body was put on, was

13  located, was put where?

14         MR. ROSENFELD:   Was put on the front gate, as I

15  understand it.   The next date, for whatever reason --

16         THE COURT:   Front gate of what?

17         MR. ROSENFELD:   The offices of Respublika.

18         THE COURT:   Uh huh, okay, go ahead.

19         MR. ROSENFELD:   The next day they put the dog's

20  head on the front gate with another threatening note.

21  After that the offices were fire-bombed, Your Honor, and

22  ultimately fearing for their life, the principals of

23  Respublika fled the country.   So these are not imagined

24  threats.   We haven't been in a position where we've had to

25  prove that these came from Kazakhstan, but those are the

45

1   reasons they left the country and those are things that

2   have been looked at, as I said, by these congressional

3   committees and human rights group and roundly criticized.

4

5           THE COURT:    When did this conduct occur?

6   Approximately.  I'm not looking for a precise date.  A year

7   ago, was it ten years ago, was it five years ago?

8           MR. ROSENFELD:    I think it was a – I think it

9   was – hold on one second, Your Honor.  My best recollection

10  is it was a few to five years ago, but I'd have to confirm

11  those facts.  I don't have them in front of me.  And they –

12  I don't know when they fled and have been out of the

13  country operating on the internet.  We made, you know, I

14  have my affidavit which I mentioned with a lot of materials

15  on this in the record, but I just don't have those facts at

16  my fingertips right now.

17          MR. SEMMELMAN:    Your Honor, may I respond to

18  what I just heard?

19          THE COURT:    Go ahead.

20          MR. SEMMELMAN:    I have no knowledge of any of

21  these tales having to do with dogs being decapitated or

22  anything like that, although I read that in the

23  unsubstantiated submission of counsel, and Mr. Rosenfeld

24  himself has said the assumption is that the Government of

25  Kazakhstan was behind that.  Well, that's not proof, that's

```
 1                                                    46
 2  not evidence.  I have no idea what happened, I have no idea
 3  --
 4          THE COURT:   I mean if this happened shortly
 5  after an article critical of the government, which is what
 6  I thought Mr. Rosenfeld was suggesting, I mean there's an
 7  inference there that can be drawn.  Nobody here was born
 8  last night and --
 9          MR. SEMMELMAN:   Well, look, all I can say is I
10  don't know what happened, but there's evidence, there's no
11  evidentiary proof that would be normally admitted in a
12  courtroom that says the Government of Kazakhstan had
13  anything to do with this, assuming it actually happened,
14  and I have no knowledge of that.  But assuming some version
15  of this actually happened, where's the proof that the
16  Government of Kazakhstan was behind it?  And moving beyond
17  that, what does that have to do with taking a deposition in
18  London?
19          We're introducing or Mr. Rosenfeld is introducing
20  inflammatory allegations without proof and saying, well,
21  because of this we shouldn't have a deposition in London.
22  Well, deposition in London has nothing to do with anything
23  that he's talking about.  We're here in a U.S. federal
24  court, we're gonna take a deposition under the ultimate
25  oversight of Your Honor.  There'll be a transcript of
```

1

2    everything that happens.  We plan to videotape so there'll

3    be a videotape of everything that happens.  So what are we

4    talking about here?  What Mr. Rosenfeld is describing, even

5    if he could prove it up, which he hasn't done, but even if

6    he could, what does that have to do with taking a

7    deposition?

8                THE COURT:   All right.  All right, look, after

9    hearing everybody - Respublika's status right now is a non-

10   party.  It's not named in the complaint and we know from

11   Judge Ramos' decision of last evening that it's not subject

12   to the injunction on the current record.  So it's a non-

13   party at this point.  It's not someone subject to the

14   injunction.  So it can be deposed as a non-party witness.

15   In footnote 1 of the joint letter dated October 26,

16   Respublika states it doesn't contend that the court lacks

17   jurisdiction over it, and it probably couldn't in light of

18   the fact that it affirmatively sought relief in this court.

19                I think it is appropriate that Respublika be

20   deposed as a non-party witness with respect to the claims

21   asserts in the complaint.  And I also think that - look, I

22   mean everyone here is going into this with their eyes open.

23   I also think that an oral deposition is probably most

24   appropriate.  The written depositions are sometimes

25   appropriate, but they're a poor substitute for an oral

48

1  deposition.  As I indicated in my questioning, the answers

2  to a written deposition on written questions, the answers

3  are usually crafted by lawyers.  I'm not talking about what

4  anybody would do here, but frequently when lawyers draft

5  answers to written questions, their goal is to obscure and

6  hide as much information as possible as opposed to

7  disclosing information.  So I don't think the written – and

8  also you can't ask follow-up questions, so also I don't

9  think – so I don't the deposition on written questions is

10  really an adequate substitute.

11        With respect to the topics that can be asked

12  about at the deposition, number 4 is withdrawn, and I'm

13  hard-pressed to see how 5 and 6 are appropriate.  As I

14  indicated before, there is voluminous case law, it's cited

15  in my earlier opinion in Bridgewater against Taylor, 745 F.

16  Supp. 2d 355.  It's also discussed by Judge Lynch when he

17  was in the district court in the Podany case at 350 F.

18  Supp. 2d 375.  There's voluminous authority that a party is

19  not entitled to take discovery to see if it has a claim

20  against another party until, that you've got to state a

21  claim before you get discovery to see if you have a claim.

22  I don't see how topics 5 and 6 of the 30(b)(6) relate to

23  the allegations in the complaint that was filed in this

24  case on March 12 of this year.

1                                                                    49

2          But this is what I'm gonna do.  Do you have a

3  timetable for when you're going to be going to London or –

4  have you talked about potential dates?

5          MR. SEMMELMAN:   We have not identified specific

6  dates, but we have indicated that we will be very flexible,

7  and we will pick a date that is convenient for everybody.

8          THE COURT:   Well, is there a window – let me

9  tell you why I ask the question.  I want to give you a

10 chance to submit – if you have authority that justifies 5

11 and 6, I'd like to get that authority before you go to

12 London, and I want to give you an opportunity to submit any

13 authority you have justifying topics 5 and 6.  And I want

14 to set a timetable for that.  So that's why asking if

15 you've got a window of time you're looking at for your trip

16 to London.

17         MR. SEMMELMAN:   There's no specific window, so

18 whatever timetable the Court suggests for the written

19 submission on 5 and 6 will be fine.

20         THE COURT:   All right.  Can you make – Mr.

21 Semmelman, can you make your submission by a week from

22 today and, Mr. Rosenfeld, can you submit a response by a

23 week after that?

24         MR. ROSENFELD:   That's fine with us, Your Honor.

25         THE COURT:   Does that work both of you?

1

2          MR. SEMMELMAN:   Yes, Your Honor.

3          THE COURT:   And your submission's actually going

4   to be due on the 12th, Mr. Rosenfeld, because the 11th is

5   still observed as a court holiday.  It's Veteran's Day or

6   Armistice Day.  Okay?  All right.  Yeah, so I think topics

7   1, 2, and 3, 7 and 8 are permissible; 4 is withdrawn; and

8   I'll get a submission on justifying 5 and 6.  It's conduct

9   that post-dates the complaint, so I'm not sure – I'm really

10  hard-pressed to see how it's relevant to the complaint.  It

11  seems like it's more geared to determining whether the

12  plaintiff has a claim against Respublika which the cases

13  indicate you don't get until you state a claim.

14          All right.  Mr. Rosenfeld, anything else we

15  should be considering today from your point of view?

16          MR. ROSENFELD:   No, Your Honor.

17          THE COURT:   Okay, Mr. Semmelman?

18          MR. SEMMELMAN:   No.  Thank you very much, Your

19  Honor.

20          THE COURT:   All right, thank you all.

21          MR. ROSENFELD:   Thank --

22          (Whereupon the matter is adjourned.)

23

24

25

1                                                                    51

2                    C E R T I F I C A T E

3

4           I, Carole Ludwig, certify that the foregoing

5   transcript of proceedings in the United States District

6   Court, Southern District of New York, The Republic of

7   Kazakhstan v. Does 1-100, Docket #15cv1900, was prepared

8   using digital transcription software and is a true and

9   accurate record of the proceedings.

10

11

12

13

14   Signature_____

15

16   Date:  October 30, 2015

17

18

19

20

21

22

23

24

25